306 F.3d 874
 MONTANA RIGHT TO LIFE ASSOCIATION; Montana Right to Life Political Action Committee; Julie Daffin, President of Montana Right to Life Association, Plaintiffs-Appellants,
v.
Robert EDDLEMAN, in his official capacity as County Attorney for Stillwater County, Montana, and as a representative of the class of County Attorneys in the State of Montana, et al., Defendant-Appellee.
 No. 00-35924.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 7, 2002.
 Filed September 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED James Bopp, Jr., Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, for the plaintiff-appellant.
 Brian M. Morris, Solicitor, Helena, MT, for the defendant-appellee.
 Appeal from the United States District Court for the District of Montana; Jack D. Shanstrom, District Judge, Presiding. D.C. No. CV-96-00165-JDS.
 Before ALARCÓN and SILVERMAN, Circuit Judges, and TEILBORG, District Judge.*
 Opinion by Judge SILVERMAN; Dissent by Judge TEILBORG.
 OPINION
 SILVERMAN, Circuit Judge.
 
 
 1
 In 1994, Montana voters passed various campaign finance reform measures contained in a ballot proposition known as Initiative 118. At issue in this case are two of the provisions contained in that initiative. The first lowers the maximum dollar amount both political action committees and individuals may contribute to a political candidate; the second limits the aggregate dollar amount a candidate may receive from all PACs combined. Plaintiffs-appellants brought suit to invalidate some of the measures in Initiative 118, claiming they unduly burdened protected speech and associational rights. After a four-day bench trial, the district court made numerous factual findings and struck down portions of Initiative 118 not at issue here. As to the two provisions challenged on appeal, the district judge upheld them as sufficiently tailored to achieving Montana's important interest in preventing corruption and the appearance of corruption in Montana politics.
 
 
 2
 We affirm. The district court's factual findings are adequately supported by the record and are not clearly erroneous. Applying these facts to the analytical framework set forth in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), we agree that the two challenged provisions do not violate the First Amendment.
 
 I. Factual Background
 
 3
 In 1994, Montana voters passed Initiative 118, a campaign finance reform scheme containing, among other provisions, two sections that were subsequently enacted as Mont.Code Ann. (M.C.A.) §§ 13-37-216 and -218. The first provision at issue here, M.C.A. § 13-37-216, imposes limits on individual and political action committee contributions to state candidates, the amount of which varies with the office sought.
 
 
 4
 Aggregate contributions for each election in a campaign by a political committee or by an individual, other than a candidate, to a candidate are limited as follows:
 
 
 5
 (i) for candidates filed jointly for the office of governor and lieutenant governor, not to exceed $400;
 
 
 6
 (ii) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $200;
 
 
 7
 (iii) for a candidate for any other public office, not to exceed $100.
 
 
 8
 Mont.Code Ann. § 13-37-216(1)(a). Because these limits apply to "each election in a campaign," the amount an individual may contribute to a candidate doubles when the candidate participates in a contested primary. While M.C.A. § 13-37-216 lowered the amount of money that individuals and PACs can contribute to candidates, it increased the amount that political parties are permitted to contribute. Id. § 13-37-216(3).[1]
 
 
 9
 The second provision at issue in this appeal, M.C.A. § 13-37-218, limits the amount that a candidate for the state legislature may receive from all political action committees combined. It provides in pertinent part:
 
 
 10
 A candidate for the state senate may receive no more than $1,000 in total combined monetary contributions from all political committees contributing to the candidate's campaign, and a candidate for the state house of representatives may receive no more than $600 in total combined monetary contributions from all political committees contributing to the candidate's campaign. The limitations in this section must be multiplied by the inflation factor [defined elsewhere]. The resulting figure must be rounded off to the nearest $50 increment.
 
 
 11
 Id. § 13-37-218. Adjusted for inflation, the PAC contribution ceiling at the time of trial was $2,000 for state senate candidates and $1,250 for state house candidates. Under M.C.A. § 13-37-218, a candidate is permitted to accept additional PAC contributions once the aggregate PAC contribution limit has been reached, provided that he returns funds to earlier PAC donors to make room for later-received contributions. It is important to note that M.C.A. § 13-37-218 does not prevent PACs from contributing to political parties, nor does it prevent PACs from spending money on independent political advertisements or otherwise engaging in political speech. Section 13-37-218 merely limits how much PACs as a group can donate to any one candidate.
 
 
 12
 The Montana Right to Life Association, Montana Right to Life Political Action Committee, and Julie Daffin, President of the Montana Right to Life Association (collectively, "MRLA") have all made or attempted to make contributions to Montana legislative candidates. MRLA brought this lawsuit in 1996, challenging six of the campaign finance reform measures contained in Initiative I-118.
 
 
 13
 The district court granted partial summary judgment to MRLA, declaring four of the initiative's provisions unconstitutional, but left for trial the constitutionality of M.C.A. §§ 13-37-216 and -218. After a four-day bench trial, the district court issued findings of fact and conclusions of law, upholding the two provisions at issue here. The district court relied in part on the testimony of Jonathon Motl, the drafter of the ballot initiative, that I-118 affects only the largest contributions to the various offices. The judge found that the limits imposed by M.C.A. § 13-37-216 "were in the upper 10% of contributions for the particular offices." That is, nine out of ten donations to political candidates were unaffected by this measure.
 
 
 14
 The district court also found that M.C.A. § 13-37-218, the aggregate PAC contribution limit provision, had the effect of limiting the amount the average candidate received from PACs to about 29% of all contributions received. The court found that, at the time of trial, state house candidates continued to raise an average of $4,464.87, and state senate candidates continued to raise an average of $6,869.04, despite the limits imposed by M.C.A. § 13-37-218. The evidence further showed that the cost of a House race in Montana was between $3,000 and $7,000, and a Senate race between $6,000 and $9,000. The district court thus found that MRLA was unable to demonstrate that the limits imposed left candidates with insufficient funds to run an effective campaign: "[O]utside of bald, conclusory allegations that their campaigns would have been more `effective' had they been able to raise more money, none of the witnesses offered any specifics as to why their campaigns were not effective." It further found that "there is no indication that the contribution limitations imposed would have any dramatically adverse effect on the funding of campaigns and political associations...."
 
 
 15
 Applying the standards announced by the Supreme Court in Shrink Missouri, the district court ultimately ruled that the State of Montana's political contribution limits were "closely drawn to match the constitutionally sufficient interest in preventing campaign corruption and the appearance thereof." The limits "are not so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." MRLA appeals this ruling.
 
 II. Standard of Review
 
 16
 We review the constitutionality of state statutes de novo. California Democratic Party v. Jones, 169 F.3d 646, 647 (9th Cir.1999), rev'd on other grounds, 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). We review the district court's findings of fact for clear error. Montana Chamber of Commerce v. Argenbright, 226 F.3d 1049, 1054 (9th Cir.2000) (reviewing a district court's findings of fact in a campaign contribution limit case under the "clearly erroneous" standard without discussion); Service Employees Int'l Union v. Fair Political Practices Comm'n, 955 F.2d 1312, 1316 (9th Cir.1992) (same). The district court's application of the law to those facts is reviewed de novo. Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).
 
 
 17
 III. Supreme Court Decisions Regarding the Constitutionality of Campaign Finance Restrictions
 
 
 18
 The starting place in the analysis of the constitutionality of campaign finance reform legislation is Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Buckley involved a challenge to the Federal Election Campaign Act. The Act (1) limited individual contributions to any single candidate to $1,000 per election, with an overall annual limitation of $25,000 by any contributor; (2) limited independent expenditures by individuals and groups relative to a clearly identified candidate to $1,000 per year; (3) subjected campaign spending by candidates and political parties to prescribed limits; and (4) required public disclosure of all contributions and expenditures above defined limits.
 
 
 19
 The Buckley Court held that although the provisions limiting contributions to candidates were constitutional, the provisions limiting expenditures by candidates were invalid, violating candidates' freedom of speech. Id. at 20-21, 96 S.Ct. 612. With respect to the contribution limitations, the Court made three important observations. First, regarding a contributor's right to free speech, the effect of the contribution limitation was minimal:
 
 
 20
 A limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.... A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.
 
 
 21
 Id. (emphasis added).
 
 
 22
 Second, regarding the effect on a candidate's free speech rights, the Buckley Court held that contribution limits are constitutional as long as they do not prevent candidates from "amassing the resources necessary for effective advocacy." Id. at 21, 96 S.Ct. 612. If a candidate is merely required "to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression," the candidate's freedom of speech is not impugned by limits on contributions. Id. at 21-22, 96 S.Ct. 612.
 
 
 23
 Finally, the Buckley Court observed that the main concern raised by contribution limitations was whether they interfered with a contributor's right of association. Id. at 24-25, 96 S.Ct. 612. "Making a contribution, like joining a political party, serves to affiliate a person with a candidate." Id. at 22, 96 S.Ct. 612. Recognizing that freedom of political association is a "basic constitutional freedom," the Court held that restrictions on that right are subject to the "closest scrutiny." Id. at 25, 96 S.Ct. 612. The Court was careful to note, however, that "neither the right to associate nor the right to participate in political activities is absolute.... Even a significant interference may be sustained if the State demonstrates a sufficiently important interest and employs a means closely drawn to avoid unnecessary abridgment of associational freedoms." Id. at 25, 96 S.Ct. 612 (citations and internal quotation marks omitted).
 
 
 24
 The Supreme Court reaffirmed the principles announced in Buckley when it upheld a state campaign contribution limitation in Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).[2] Shrink Missouri involved a Missouri statute that imposed contribution limits ranging from $275 to $1,075, depending on the office or size of the candidate's constituency and accounting for inflation. Id. at 382, 120 S.Ct. 897. The Shrink Missouri Government PAC and an unsuccessful candidate for state auditor sued to enjoin enforcement of the statute, claiming that it violated the First and Fourteenth Amendments.
 
 
 25
 Upholding the statute as constitutional, the Shrink Missouri Court emphasized Buckley's holding that "a contribution limit involving a `significant interference' with associational rights could survive if the Government demonstrated that the regulation was `closely drawn' to match a `sufficiently important interest,' though the dollar amount of the limit need not be `fine-tuned.'" Id. (citations omitted). Shrink Missouri also stressed that courts considering contribution limits, as opposed to expenditure limits, need not be overly concerned with the precise standard of scrutiny to be applied because, in general, "limiting contributions [leaves] communications significantly unimpaired," and "contribution limits ... more readily clear the hurdles before them" than would analogous expenditure limits. Id. at 387-88, 120 S.Ct. 897.
 
 
 26
 Shrink Missouri recognized that Buckley "specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate." Id. at 397, 120 S.Ct. 897. Rather, the Court said that the outer limits of constitutional contribution limitations are defined by whether the limitation is so low as to impede a candidate's ability to "amass the resources necessary for effective advocacy." Id. at 397, 120 S.Ct. 897. The question to be asked in evaluating laws that limit campaign contributions, then, is whether "the contribution limitation is so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." Id.
 
 
 27
 The bottom line is this: After Buckley and Shrink Missouri, state campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn" — i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign. With these principles in mind, we now turn to whether Montana's campaign limits pass muster under Buckley and Shrink Missouri.
 
 
 28
 IV. M.C.A. § 13-37-216, limiting individual and PAC campaign contributions, is constitutional.
 
 
 29
 A. The State of Montana presented sufficient evidence of its asserted interest in avoiding corruption or the appearance of corruption.
 
 
 30
 Montana asserts that the campaign contribution limitation on individuals and PACs is necessary to avoid corruption or the appearance of corruption in Montana politics. MRLA does not dispute that this interest is sufficient to justify campaign contribution limits. Rather, it argues that the limits imposed are unnecessarily stringent and there is no evidence that restricting contributions to such small amounts is needed to combat corruption.
 
 
 31
 This, however, is not the appropriate inquiry. The correct focus under Shrink Missouri is whether the state has presented sufficient evidence of a valid interest, not whether it has justified a particular dollar amount. The latter inquiry, if ever appropriate, occurs in the second part of our analysis, in examining whether the restriction is "closely drawn." See, e.g., California Prolife Council Political Action Comm. v. Scully, 989 F.Supp. 1282, 1292 (E.D.Cal.1998) ("[A]s a general matter, the court will not second guess a legislative determination as to where the line for contribution limits shall be drawn."). With respect to whether Montana has presented sufficient evidence of corruption or the appearance of corruption, we agree with the district court that it has.
 
 
 32
 A state's interest in preventing corruption or the appearance of corruption is not confined to instances of bribery of public officials, but extends "to the broader threat from politicians too compliant with the wishes of large contributors." Shrink Missouri, 528 U.S. at 389, 120 S.Ct. 897. With respect to the quantum of evidence necessary to justify this interest, the Supreme Court has required only that the perceived threat not be "illusory," Buckley, 424 U.S. at 27, 96 S.Ct. 612, or "mere conjecture," Shrink Missouri, 528 U.S. at 392, 120 S.Ct. 897. The amount of evidence needed will thus "vary up or down with the novelty and plausibility of the justification raised." Id. at 391, 120 S.Ct. 897. The Shrink Missouri Court found sufficient evidence of the potential of contributions to corrupt simply in a state senator's statement that contributions had the "real potential to buy votes," a smattering of newspaper articles reporting large contributions, and the fact that 74% of Missouri voters determined that contribution limits were necessary. Id.
 
 
 33
 The evidence presented by the State of Montana in this case is sufficient to justify the contribution limits imposed, and indeed carries more weight than that presented in Shrink Missouri. The record contains the testimony of a 30-year veteran of the Montana legislature who stated that special interests funnel more money into campaigns when particular issues approach a vote "because it gets results." The state also pointed to a 1981 incident in which a Republican state senator dispatched a letter to his colleagues urging them to vote for passage of a bill favoring variable annual annuities to ensure that a highly disproportionate share of PAC contributions from the insurance industry continued to flow to the Republican party. The letter read in part:
 
 
 34
 Please destroy this letter after reading. Why? Because the Life Underwriters Association in Montana is one of the larger Political Action Committees in the state, and I don't want the demos to know about it! In the last election they gave $8000 to state candidates.... Of this $8,000 — Republicans got $7000 — you probably got something from them. This bill is important to the underwriters and I have been able to keep the contributions coming our way. In 1983, the PAC will be $15,000. Let's keep it in our camp.
 
 
 35
 The Montana press published the contents of the senator's letter. Although the author of the letter was ultimately cleared of wrongdoing, the letter and attendant publicity spawned five separate investigations.
 
 
 36
 A 1982 poll indicated that 78.3% of Montana voters believe money is synonymous with power. Another 69% of Montanans say that elected officials give special treatment to individuals and businesses that make large contributions. The district court found that MRLA had offered no evidence that Montana voter suspicion or perception was to the contrary. Moreover, MRLA is incorrect to suggest that our reliance on such evidence is impermissible. In Shrink Missouri, the Court relied, in part, on similar evidence: the result of a referendum election relating to contribution limits. See Shrink Missouri, 528 U.S. at 394, 120 S.Ct. 897. Cf. Atkins v. Virginia, ___ U.S. ___, ___ - ___, 122 S.Ct. 2242, 2248-50, 153 L.Ed.2d 335 (2002) (relying on public consensus as evidence of what constitutes cruel and unusual punishment in a death penalty case). Taken together, the evidence presented below suffices under Shrink Missouri to establish Montana's interest in avoiding corruption or the appearance of corruption. The state's interest is neither illusory or conjectural.
 
 
 37
 B. M.C.A. § 13-37-216 is "closely drawn" to avoid unnecessary abridgment of associational freedoms.
 
 
 38
 MRLA also challenges M.C.A. § 13-37-216 as insufficiently tailored to the state's interest in preventing corruption, arguing that it prevents candidates from amassing needed resources, discriminates against challengers, and unconstitutionally prohibits both small and large contributions. We disagree.
 
 
 39
 A campaign contribution limitation is "closely drawn" if it
 
 
 40
 focus[es] on the narrow aspect of political association where the actuality and potential for corruption have been identified — while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist in a limited but nonetheless substantial extent in supporting the candidates and committees with financial resources.
 
 
 41
 Buckley, 424 U.S. at 28, 96 S.Ct. 612. In examining whether a contribution limitation is sufficiently tailored to a state's asserted interest, the focus is as much on those aspects of associational freedom unaffected by the law as the limitations that are imposed. We are mindful that the dollar amounts employed to prevent corruption should be upheld unless they are "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice beyond the level of notice, and render contributions pointless." Shrink Missouri, 528 U.S. at 397, 120 S.Ct. 897. In making this determination, we look at all dollars likely to be forthcoming in a campaign, rather than the isolated contribution, id., and we also consider factors such as whether the candidate can look elsewhere for money, Buckley, 424 U.S. at 21-22, 96 S.Ct. 612, the percentage of contributions that are affected, Daggett, 205 F.3d at 461, the total cost of a campaign, id., and how much money each candidate would lose, id.
 
 
 42
 We agree with the district court that the state's contribution limits are closely drawn to further its interest in preventing corruption and the appearance of corruption. The district court found that the contribution limits affect only the top 10% of contributions, and that the percentage affected includes the largest contributions. As the testimony of the statute's drafter, Jonathon Motl, makes clear, this finding was not clearly erroneous. MRLA's contention that M.C.A. § 13-37-216 unconstitutionally prohibits both small and large contributions is thus without merit.
 
 
 43
 In addition, M.C.A. § 13-37-216, while decreasing PAC and individual contributions, simultaneously increased the amount of money political parties may contribute to a candidate, almost doubling the amount that may be contributed in some races. The statute also did not limit the amount a candidate may give to himself, or the number of individuals from whom he can seek contributions. Candidates can therefore look elsewhere for forms of funding unaffected by the limitations imposed by M.C.A. § 13-37-216. Moreover, the statute in no way prevents PACs from affiliating with their chosen candidates in ways other than direct contributions, such as donating money to a candidate's political party, volunteering individual members' services, sending direct mail to their supporters, or taking out independent newspaper, radio, or television ads to convey their support.
 
 
 44
 The evidence before the district court showed that the State of Montana remains one of the least expensive states in the nation in which to run a political campaign. Montana's 100 house districts average only 7,991 people, its 50 senate districts 15,981 people. Legislative candidates in Montana campaign primarily door-to-door, and only occasionally advertise on radio and television. It is undisputed that the total money contributed to political campaigns in the State of Montana has decreased considerably since the challenged measures went into effect. The parties agree that, of the money raised in the 1992 legislative election, before M.C.A. § 13-37-216 was enacted, 24% to 30% came from contributions that would now violate the new limits. That alone, however, does not make the contribution limits unconstitutional. Indeed, the Shrink Missouri Court upheld contributions limits despite a decrease of more than 50% in total spending in Missouri elections, nearly twice the decrease present here. See Shrink Missouri, 528 U.S. at 426 n. 10, 120 S.Ct. 897 (Thomas, J., dissenting). The district court found that the average amount raised by a Montana house candidate in 1998, with the challenged limits in effect, was $4,464.87, a figure well within the range of money needed to run an effective house campaign. The same is true for the $6,869.00 average raised by state senate candidates. We cannot agree with MRLA that the challenged limits have impeded candidates' campaigns to such an extent that speech and associational rights have been impermissibly abridged.
 
 
 45
 As the district court found, Montana candidates remain able to mount effective campaigns, a primary concern in our inquiry. MRLA, however, presented the testimony of three candidates who claimed that the new limits preclude effective campaigning. We agree with the district court that this evidence is unpersuasive. Two of the witnesses raised more money after the enactment of M.C.A. § 13-37-216 than before, two were successfully elected to their positions, and the one losing candidate admitted that his absence during a pivotal campaign period prevented him from raising sufficient funds to win. Another MRLA witness, a campaign manager for a successfully elected Montana legislator, acknowledged that her candidate won with a $70,000.00 surplus of funds. We fully agree with the district court's conclusion that, apart from "bald, conclusory allegations that their campaigns would have been more `effective' had they been able to raise more money, none of the witnesses offered any specifics as to why their campaigns were not effective."
 
 
 46
 It is true that the contribution limits imposed by M.C.A. § 13-37-216 are some of the lowest in the country. This is unsurprising in light of the fact that Montana is one of the least expensive states in the nation in which to mount a political campaign. As long as the limits are otherwise constitutional, it is not the prerogative of the courts to fine-tune the dollar amounts of those limits. See, e.g., Shrink Missouri, 528 U.S. at 388, 120 S.Ct. 897 ("[T]he dollar amount of the limit need not be fine tuned.") (internal quotations omitted).
 
 
 47
 MRLA also claims that the state's argument, that a candidate can campaign through less expensive means, is unpersuasive if the candidate is unable to mount the same type of campaign he could have run without the limit. This ignores the point emphasized in both Buckley and Shrink Missouri that a limit on what others can give a candidate is fundamentally different from a limit on what a candidate can spend. Limitations on candidates' expenditures are viewed as direct restrictions on speech, while contribution limits are only rarely seen as restrictions on donors' First Amendment rights. Under the standards articulated for contribution limits in Buckley and Shrink Misouri, MRLA cannot argue that Montana's contribution limits impermissibly alter a candidate's message, or result in a different kind of campaign as compared to when the limits did not exist. Rather, MRLA must show that limiting donations prevents candidates from amassing the resources necessary for effective advocacy, making a donee candidate's campaign to be not merely different but ineffective. This MRLA has not done.
 
 
 48
 Finally, MRLA, noting that 40-50% of legislative seats went uncontested in the 1998 campaign, argues that the contribution limits unconstitutionally discriminate against challengers. This assertion fails for two reasons. First, while imposing contribution limits, M.C.A. § 13-37-216 also contains a provision preventing incumbents from using excess funds from one campaign in future campaigns. Such a provision keeps incumbents from building campaign war chests and gaining a fund-raising head start over challengers. The record shows that the average gap between the total amount of money raised by incumbents and challengers for all legislative races was only $65.00 per race. Second, Buckley squarely held that, without a record of "invidious discrimination against challengers as a class," there is "no support for the proposition that an incumbent's advantages [are ] leveraged into something significantly more powerful by contribution limitations applicable to all candidates, whether veterans or upstarts." Shrink Missouri, 528 U.S. at 389 n. 4, 120 S.Ct. 897. Accordingly, MRLA's argument is without merit.
 
 
 49
 Because individuals and PACs remain "free to engage in independent political expression, to associate actively through volunteering their services, and to assist in a limited but nonetheless substantial extent in supporting the candidates and committees with financial resources," Buckley, 424 U.S. at 28, 96 S.Ct. 612, we agree with the district court that M.C.A. § 13-37-216 is constitutional.
 
 
 50
 V. M.C.A. § 13-37-218, imposing an aggregate limit on PAC contributions to state legislative candidates, is constitutional.
 
 
 51
 We now turn to the aggregate limit on PAC contributions. M.C.A. § 13-37-218 provides:
 
 
 52
 A candidate for the state senate may receive no more than $1,000 [now increased to $2,000] in total combined monetary contributions from all political committees contributing to the candidate's campaign, and a candidate for the state house of representatives may receive no more than $600 [now $1,250] in total combined monetary contributions from all political committees contributing to the candidate's campaign. The limitations in this section must be multiplied by the inflation factor [defined elsewhere].
 
 
 53
 MRLA argues that the statutory limits on what a candidate may receive from all PACs unconstitutionally discriminates against PACs, unconstitutionally prohibits certain contributions entirely, impermissibly functions as a candidate spending limit, and is not tailored to any legitimate state interest.
 
 
 54
 A. The aggregate PAC limit is justified by a sufficiently important interest and does not unconstitutionally discriminate against PACs.
 
 
 55
 MRLA argues that M.C.A. § 13-37-218 unconstitutionally discriminates against PACs as opposed to individual donors. However, the differential treatment of PACs is constitutionally permissible where, as here, that treatment is necessary to serve a substantial government interest. See Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("The crucial question is whether there is an appropriate government interest suitably furthered by the differential treatment."). The State of Montana contends that the aggregate PAC limit is justified by the state's concern over the corrupting influence of PAC money on campaigns. If the record demonstrates that the danger of corruption, or the appearance of such a danger, is greater when dealing with PAC money as opposed to other contributions, then the state's justification is constitutionally sufficient. See, e.g., Austin v. Michigan Chamber of Comm., 494 U.S. 652, 658-60, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (prevention of corruption justification sufficient to justify differential treatment of corporations).
 
 
 56
 The district court found that the aggregate PAC limits are "essential" to preventing undue influence and the appearance of undue influence by special interest groups. As noted above, this finding is supported by a quantum of evidence that more than exceeds that found sufficient in Shrink Missouri. The most damning evidence was the letter from a state senator urging legislators to vote for a bill in order to keep insurance industry PAC money in the Republican camp. It is true that the investigations spawned by the letter did not result in criminal charges, but that is not the test. The voters of Montana were entitled to view the widely-publicized letter as unwholesome and indicative of the corrosive influence of PAC money on the legislative process, as they apparently did.
 
 
 57
 This view was echoed by veteran legislator Hal Harper, who testified that, in general, PACs funnel money into state legislative campaigns only when their interests are at stake in order to "get results." This testimony, like that of Missouri Senator Wayne Goodein, who stated that large contributions have "the real potential to buy votes," Shrink Missouri, 528 U.S. at 393, 120 S.Ct. 897, speaks not to particular PACs but to the potentially corrosive effects of special interest groups in general, and the corresponding justification for government actions to counteract such effects.
 
 
 58
 Many courts have recognized that the danger of corruption in the political system is greater with respect to PAC contributions than it is for individuals. See, e.g., Kentucky Right to Life v. Terry, 108 F.3d 637 (6th Cir.1997) (upholding a law to combat corruption by placing greater restrictions upon direct corporate and PAC contributions to political candidates, and lesser restrictions upon individual contributions); Landell v. Sorrell, 118 F.Supp.2d 459, 489 (D.Vt.2000) ("[T]he anti-corruption rationale ... is arguably even stronger when applied to PAC contributions.... As their name suggests, PACs exist in order to affect certain political action. The likelihood of actual quid pro quo arrangements between PACs and candidates is high."). One court has even explicitly held that, due in part to the disproportionate influence of special interests on a candidate's campaign, aggregate PAC limits are constitutionally permissible. Gard v. Wisconsin State Elections Bd., 156 Wis.2d 28, 456 N.W.2d 809, 820 (1990).
 
 
 59
 MRLA argues that the State's interest in preventing corruption and the appearance of corruption does not justify the aggregate PAC limit because M.C.A. § 13-37-218 does not differentiate on the basis of the size of any individual PAC's contribution. This ignores the fact that the size of an individual PAC's contribution is already limited by M.C.A. § 13-37-216. The two provisions before us work hand-in-glove to avoid corruption and the appearance of the same by reducing the impact of PAC money on Montana's elections, thereby encouraging candidates to have a diverse base of support. The district court found that the aggregate PAC limit was justified in part because otherwise PACs could easily evade the individual contribution limits by contributing the statutory maximum through a multitude of individual committees. Like the district court, we find this justification persuasive. Accordingly, we hold that the aggregate PAC limit is justified by a sufficiently important state interest and does not unconstitutionally discriminate against PACs.
 
 
 60
 B. The aggregate PAC limit is closely drawn to serve the state's anti-corruption purpose.
 
 
 61
 MRLA argues that M.C.A. § 13-37-218 is not sufficiently tailored to the state's anti-corruption interest, preventing some PACs from contributing anything at all. The argument goes like this: If a candidate for, say, state senate has already accepted $2,000 in PAC money, he has "PAC'd out," and other PACs are now prevented from contributing and can no longer express their support for the candidate. The flaw in this argument is that it fails to recognize that, under the Montana scheme, a candidate can return some money from one PAC to make room for other PAC money. For example, in our hypothetical, suppose the senate candidate received twenty contributions of $100 each from twenty different PACs, thus reaching the aggregate $2,000 limit. If a twenty-first PAC wished to make a $100 contribution, and if the candidate wished to accept it, the candidate could refund $100 (for example, by returning five dollars to each of the other twenty PACs) to make room for the new contribution. What matters is that so long as a candidate wants a PAC involved in funding his campaign, Montana's law does not infringe on the PACs' associational freedoms. A candidate is free to manage his PAC contributions so as to be able to accept contributions from an unlimited number of PACs, allowing them to show their support for candidates they back and participate in the electoral process.
 
 
 62
 Furthermore, M.C.A. § 13-37-218 does not prevent PACs from otherwise affiliating with a candidate in ways other than direct contributions. PACs can continue, for example, to volunteer services to a candidate's campaign, to endorse a candidate, to independently buy advertising in support of a candidate, etc.
 
 
 63
 It is important to recognize that the aggregate PAC limit does not directly affect a candidate's speech. A candidate is free to obtain additional money from other sources, including an unlimited number of individual donors, the candidate's own funds, and the candidate's political party. Moreover, a PAC may still donate to political parties without limitation. As the district court found, even with the aggregate PAC limit imposed, PAC contributions comprised nearly a third of candidates' total campaign funds in the last election. Clearly, PACs still play a significant role in Montana political campaigns, and MRLA's attempts to characterize M.C.A. § 13-37-218 as stifling PACs' voices in Montana elections are unconvincing. The limits imposed by Montana voters are not "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice beyond the level of notice, and render contributions pointless." Shrink Missouri, 528 U.S. at 387-88, 397, 120 S.Ct. 897. We therefore agree with the district court that M.C.A. § 13-37-218 is constitutional.
 
 VI. Conclusion
 
 64
 The voters of Montana are entitled to considerable deference when it comes to campaign finance reform initiatives designed to preserve the integrity of their electoral process. Our analysis in reviewing such initiatives is highly fact-intensive and relies heavily on the factual findings made by the district court in the wake of a four-day bench trial, findings that have ample support in the record and are not clearly erroneous. Applying these facts to the analytical framework set forth in Buckley and Shrink Missouri, we hold that Montana's interest in purging corruption and the appearance of corruption from its electoral system is sufficiently important to withstand constitutional scrutiny, and that M.C.A. §§ 13-37-216 and -218 are closely tailored to achieving those ends. We therefore affirm the district court's and hold that these statutes are constitutional and do not violate the First Amendment.
 
 
 65
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable James A. Teilborg, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 M.C.A. § 13-37-216(3) reads: "All political committees except those of political party organizations are subject to the provisions of subsections (1) and (2). For purposes of this subsection, `political party organization' means any political organization that was represented on the official ballot at the most recent gubernatorial election. Political party organizations may form political committees that are subject to the following aggregate limitations from all political party committees: (a) for candidates filed jointly for the offices of governor and lieutenant governor, not to exceed $15,000; (b) for a candidate to be elected for state office in a statewide election, other than candidates for governor or lieutenant governor, not to exceed $5,000; (c) for a candidate for public service commissioner, not to exceed $2,000; (d) for a candidate for the state senate, not to exceed $800; (e) for a candidate for any other public office, not to exceed $500."
 
 
 [2]
 MRLA's reliance onVanNatta v. Keisling, 151 F.3d 1215 (9th Cir.1998); Service Employees Int'l Union, 955 F.2d at 1312; and other Ninth Circuit cases interpreting Buckley fails to recognize the impact of the Supreme Court's superceding decision in Shrink Missouri.
 
 
 TEILBORG, District Judge, Dissenting in Part:
 
 66
 Under Buckley, contribution limitations can be upheld only "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). I agree with the majority that Montana has a sufficiently important interest in preventing corruption and the perception of corruption in Montana elections. I do not disagree with the majority in upholding the individual contribution limits placed on individuals and PACs. Such limits are closely drawn to the significant interest of preventing improper influence, and quid pro quo arrangements arising from large contributions. As intended, the individual limits target the upper 10% of contributions.
 
 
 67
 Where I depart from the majority is on the constitutionality of the aggregate PAC contribution limit. I disagree that the State has demonstrated a "genuine threat to its important governmental interests" or has "employ[ed] means closely drawn to avoid unnecessary abridgment" of protected activity. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 302, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (Blackmun, & O'Connor, J.J., concurring).
 
 
 68
 The Supreme Court has previously defined corruption as "a subversion of the political process" where "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("NCPAC"). I agree that Montana has a significantly important interest in preventing corruption associated with large contributions. However, I submit that large individual contributions from persons and PACs have been addressed by Montana's individual contribution limits as set forth in Mont.Code Ann. § 13-37-216 (2001). I find that having a limit on the amount an individual PAC may contribute to a candidate sufficiently prevents any one PAC from exerting "unfair influence" over a candidate. Nevertheless, the State has chosen to enact an aggregate PAC contribution limit to prevent a candidate from being overly influenced by special interests generally. The predicate for such a position must necessarily be that all PACs operate with a monolithic agenda. This ignores the obvious. Like individual persons, each PAC has its own interests and its own reasons for contributing. There is no evidence to support a proposition that all PACs exert unfair influence, or are collectively capable of doing so. I conclude that not only has the State failed to demonstrate a genuine threat, i.e., that all PAC contributions exert an unfair influence over candidates to justify the State's interest in preventing perceived and actual corruption, but the State has also failed to employ means closely drawn to that interest.
 
 
 69
 I. Inadequate evidence exists to sustain the aggregate limit.
 
 
 70
 While states should be permitted to respond to potential electoral deficiencies "with foresight rather than reactively," the response must not significantly impinge on constitutionally protected rights. Munro v. Socialist Workers Party, 479 U.S. 189, 195, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986). To sustain the aggregate PAC contribution limit, we must find under the present law a serious threat of abuse exists from collective PAC special interest contributions. See Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 457, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001).
 
 
 71
 Here, Montana's asserted purpose for the aggregate PAC limit is to prevent a candidate from being overly influenced by special interests.[1] The majority finds that the State's evidence of isolated incidents speaks not to particular PACs but to the nature of special interest groups in general. From this narrow evidence, the majority concludes that the regulation is necessary to limit the total amount of PAC contributions and encourage a diverse base of support in order to "eliminate the corrosive effects of large amounts of special interest money." It appears that Montana and the majority equate all special interest contributions with corruption without any evidentiary support.
 
 
 72
 While some courts have recognized that the potential danger of corruption is greater with respect to PAC contributions than with individuals, I find that the State has failed to demonstrate a serious threat of influence by all PACs in Montana to justify the aggregate limit. Even if one assumes there are instances of abuse by particular PACs, an aggregate limit on PAC contributions is no more justified than an aggregate limit on all individual contributions to regulate abuses by a particular contributor. Notably, in striking down a criminal statute limiting PAC expenditures, the Supreme Court observed that even if the large pooling of financial resources by PACs poses a potential for corruption or the appearance of corruption, a PAC expenditure limit is overly broad. See NCPAC, 470 U.S. at 498, 105 S.Ct. 1459. It applies not only to "multimillion dollar war chests," but equally to "informal discussion groups that solicit neighborhood contributions." Id.
 
 
 73
 By contrast, in upholding a limitation on corporate contributions and independent expenditures, the Supreme Court in Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), specified that the "mere fact that corporations may accumulate large amounts of wealth is not the justification for [the expenditure restriction]; rather, the unique state-conferred corporate structure ... warrants the limit on independent expenditures." The Court upheld the limitation on corporation expenditures based on the inherent structure of the corporation — a structure which exists in all corporations. Here, as in VanNatta v. Keisling, the State is unable to point to any evidence which demonstrates that all PAC contributions inherently lead to the sort of corruption that Montana purportedly seeks to prevent. 151 F.3d 1215, 1221 (9th Cir.1998) (holding unconstitutional a contribution limit on out-of-district residents because it was not closely drawn to advance the goal of preventing corruption). Mere conjecture that special interest money corrodes politics in Montana is inadequate to carry a First Amendment burden. See Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 392, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).
 
 
 74
 Nevertheless, the majority finds that the evidence here exceeds the evidence presented in Shrink Missouri. I disagree. In Shrink Missouri, the State presented an affidavit from a state senator who expressed that large contributions have "`the real potential to buy votes.'" Id. at 393 (quoting Shrink Mo. Gov't PAC v. Adams, 5 F.Supp.2d 734, 738 (E.D.Mo. 1998)). There were newspaper accounts of large contributions supporting inferences of impropriety. One such account examined the state treasurer's decision to engage in substantial state business with a bank which contributed $20,000 to the treasurer's campaign. Shrink Mo., 528 U.S. at 393, 120 S.Ct. 897. Another report disclosed a $40,000 contribution from a brewery and one for $20,000 from a bank to a candidate for state auditor. Id. A PAC linked to an investment bank contributed $420,000 to candidates in northern Missouri; three scandals ensued including one involving a state representative who was "`accused of sponsoring legislation in exchange for kickbacks.'" Id. (quoting Carver v. Nixon, 72 F.3d 633, 642, and n. 10 (8th Cir.1995)). Another resulted in Missouri's former attorney general pleading guilty to charges of conspiracy to misuse state property after being indicted for using a state worker's compensation fund to benefit campaign contributors. Shrink Mo., 528 U.S. at 393-94, 120 S.Ct. 897. Finally, "`an overwhelming 74 percent of the voters of Missouri determined that contribution limits are necessary to combat corruption and the appearance thereof.'" Id. at 394, 120 S.Ct. 897 (quoting Carver v. Nixon, 882 F.Supp. 901, 905 (W.D.Mo. 1995)). These instances of actual and perceived corruption based on large contributions sufficiently justified the individual limits upheld in Shrink Missouri.
 
 
 75
 Not only do Montana's instances of corruption pale by comparison to the facts in Shrink Missouri, in my opinion, they simply do not demonstrate a serious threat of abuse by all PACs to justify an aggregate limit on PACs while simultaneously raising the amount political parties may contribute to a candidate. Montana cites a memorandum by a Republican legislator as evidence of corruption in the Montana legislature. The memorandum states that the legislator wants to keep the particular PAC money within the Republican party and not allow that money to be shared with Democrats. Although five separate investigations were conducted, no convictions, or even indictments ensued. Thus, this incident does not justify a restriction placed on PACs generally. It is ironic that the State cites this episode as a justification for restraining aggregate PAC contributions to candidates, when it can be cited as powerful evidence of PAC influence on political parties, parties to which this very legislation permits PACs to make unlimited contributions. As discussed below, this anomaly simply dramatizes how inadequately tailored this law is to prevent a supposed corruption of Montana politics.
 
 
 76
 Montana also cites efforts by the gambling industry to prevent the passing of an automatic system of monitoring video gambling and efforts by the electric power industry to deregulate prices as examples of corruption associated with PAC contributions. Without any evidence of quid pro quo arrangements or other illegal or improper conduct, Montana asserts that these "results" are manifest examples of undue influence by PAC money. I find that this evidence is at most inconclusive.
 
 
 77
 Next, the State points to a poll of voters in support of campaign reform as evidence of perceived corruption. This poll did not specifically address PACs or special interest groups. Even if it did, I question whether a poll of the constituents is sufficient evidence, or is even probative to show the existence of perceived corruption. Issues of fundamental freedom should not be decided by majority vote, much less by a public opinion poll; thus, the poll results here should not be considered by the panel. The Tenth Circuit noted that "[w]e should not allow generic public dissatisfaction to support the restriction of political speech." Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 213 F.3d 1221, 1230 n. 6 (10th Cir.2000), rev'd on other grounds, 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (citing NCPAC, 470 U.S. at 499-500, 105 S.Ct. 1459) ("newspaper articles and polls purportedly showing a public perception of corruption" are insufficient to justify a limitation on the independent expenditures of PACs). In NCPAC, the Supreme Court implicitly affirmed the district court's exclusion of the proffered evidence of newspaper articles and polls purportedly showing a public perception of corruption as irrelevant. 470 U.S. at 499, 105 S.Ct. 1459. Likewise, in an Eighth Amendment challenge to capital punishment for 16- and -17-year-old offenders, the Supreme Court "decline[d] the invitation to rest constitutional law upon such uncertain foundations" as public opinion polls. Stanford v. Kentucky, 492 U.S. 361, 377, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).[2] The panel should follow the Supreme Court's dictate to reject public opinion polls on issues of constitutional importance.[3]
 
 
 78
 Finally, the State relies on low voter turnout to demonstrate the negative impact on public perception created by the involvement of large amounts of PAC money in political campaigns. I agree that voter turnout may be a better measure of the constituency's perceived corruption of elections. The Supreme Court, however, has noted that the fact that the voters passed the initiative to establish contribution limits is not dispositive; "majority votes do not defeat First Amendment protections." Shrink Mo., 528 U.S. at 394, 120 S.Ct. 897. Montana enjoys one of the five highest voter turnouts in the country. (ER 246). Although the State asserts that nearly half of the eligible voters in Montana did not vote in the 1998 general election because they lacked faith that their vote made a difference, the record does not reflect increased voter confidence post-reform.
 
 
 79
 Thus, the State fails to justify the need for the aggregate PAC contribution limit, in addition to the individual PAC limit, in order to prevent the type of corruption or perceived corruption that allegedly exists in Montana. Based on the inconclusive evidence of undue influence by PAC contributions in the record, the individual PAC limit more than suffices to prevent any undue influence on legislators caused by large contributions. I have found no basis for concluding that PACs are generally corrupt or perceived to be corrupt, nor any justification for further restricting PAC participation in legislative campaigns.
 
 
 80
 II. The limit is not closely drawn to avoid unnecessary abridgement of First Amendment freedoms.
 
 
 81
 The majority concludes that there is sufficient justification in the record to demonstrate that the danger of corruption (or the appearance of corruption) is greater when dealing with PAC money as opposed to other contributions. Assuming that PACs are perceived to be a source of corruption, the State's goal of encouraging a diverse base of support is thwarted when the State places a limit on the aggregate amount of PAC contributions a candidate may receive. By instituting such a limit, the State has, unjustifiably, restricted PAC participation in legislative campaigns and unnecessarily abridged their associational freedoms.
 
 
 82
 To be "closely drawn," the degree of restriction must bear a sufficiently close relation to the reasons proffered by the State. We must consider whether, "within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns." Supreme Ct. of Va. v. Friedman, 487 U.S. 59, 67, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (deciding whether the degree of discrimination is closely drawn to the State's reasons in the Privileges and Immunities clause context); see also Elrod v. Burns, 427 U.S. 347, 363, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("to survive constitutional challenge, [the encroachment of First Amendment protections] must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.") (emphasis added).
 
 
 83
 The State argues that by placing an aggregate limit on PAC contributions, candidates obtain a more diverse base of contributions and thereby prevent undue influence by special interests. However, the State fails to demonstrate that PAC contributions, when individually limited to $400/ $200/$100 depending on the office, are not sufficiently curtailed to alleviate a perception of corruption or a danger of undue influence. The State contends that large amounts of special interest money have a corrosive effect on Montana politics. It fails to show that PACs in general create a perception of corruption. I acknowledge that courts have found that the danger of corruption is greater with PAC contributions than with individuals. Such a determination may justify individual limits to combat quid pro quo arrangements from large contributors, but it does not justify an overbroad aggregate PAC limit that does little more than restrict speech and association rights.
 
 
 84
 Unlike Shrink Missouri, where individual PAC contributions are limited to a certain amount based on the specified state office or size of constituency, here aggregate PAC contributions are capped and a candidate must give back a portion of its PAC collections in order to receive contributions from another PAC. Clearly, Montana's aggregate limit has a more restrictive effect than the contribution limits upheld in Shrink Missouri. This demonstrates that the State has not employed the least restrictive alternative in furthering its purpose.
 
 
 85
 Montana has asserted that corruption (or perceived corruption) exists when PAC contributions make up a large portion of a candidate's campaign treasury, but has not made a closely drawn determination of what portion of a candidates' contributions is "large" enough to create the perception of corruption. Rather, Montana has made an arbitrary determination of what amount of PAC money is allowed, without regard to the ratio of PAC money to other contributions.
 
 
 86
 While the district court found that the aggregate PAC contribution limit has lowered the amount of PAC money to about 29 percent of all contributions received by the average candidate, the same result can be achieved when a candidate receives more individual contributions or party contributions, rendering PAC contributions a smaller portion of the candidates' campaign collection. Thus, Montana's aggregate PAC contribution limit arbitrarily restricts more First Amendment rights than necessary without achieving any appreciable goal.
 
 
 87
 Veteran legislator Hal Harper testified that PACs funnel money into state legislative campaigns only during elections when their interests are at stake. It seems obvious to me that the perception of corruption would be lessened if legislative candidates accepted contributions from PACs on both sides of the issue. A candidate would then have a more diverse base of support to combat the perception of corruption, instead of being precluded from accepting contributions from a competing side because the candidate is "PAC'd out."
 
 
 88
 The State's chosen means is neither closely drawn, nor effective to achieve a diverse base of contributions. If a candidate "PACs out," a candidate may collect PAC money "funneled" through a party, but from no or very few individuals. This leads to the same supposed corrosive effect of large amounts of special interest money in legislative elections (or the large proportion of PAC money that makes up a candidate's contributions) which Montana seeks to eliminate. As referenced above, the memorandum by the Montana Republican legislator demonstrates that PAC money may allegedly corrupt or be perceived to corrupt candidates as well as political parties.[4] Placing a limit on the amount PACs can contribute to an individual candidate, but not placing a limit on PAC contributions to a party and simultaneously increasing the amount a party can contribute to a candidate, will tend to encourage circumvention of the statute and possibly create the corruption that Montana seeks to prevent. As the majority noted, a PAC may donate to political parties without limitation. I submit that the aggregate restriction is little more than an arbitrary limitation which substantially impinges on PACs' rights of association and free speech.
 
 
 89
 While I recognize that the aggregate limit allows candidates to return some PAC money to make room for other PAC contributions, the reality of the limitation is that candidates, such as Senator Ric Holden, are forced to reject contributions and to refrain from soliciting contributions from other PACs which would otherwise support a candidate. (See ER 511-12). While the candidate can return some money in order to receive other contributions, there is no incentive for the candidate to do so. A real risk exists that the candidate will not be able to replace the funds he returns, thereby creating even less incentive to refund PAC money already collected. (See ER 45, 795-96, 807). If the purpose of the restriction is to increase the support base of candidates, why is the State making it more difficult for a candidate to receive contributions from multiple PACs?
 
 
 90
 While the majority applauds the restriction for not imposing a restraint on a candidate's speech, I am not convinced that the associational rights of PACs have not been unnecessarily abridged. The majority's example of this refund system demonstrates the likely encroachment. If a candidate for the senate has already accepted $100 from each of twenty different PACs, and wishes to accept a $100 contribution from another PAC, the candidate would need to return $5 to each of the other twenty PACs. The amount available to the candidate will not change regardless of whether he accepts the twenty-first PAC's contribution. The act of refunding $5 to each of twenty PACs every time the candidate would like to receive another PAC's contribution would cause the sheer logistics of the process to discourage the candidate from accepting that twenty-first contribution.
 
 
 91
 As a result, when a candidate rejects a contribution that he would otherwise have accepted but cannot because he has "PAC'd out" and does not or cannot refund money "to make room for the contribution," the rejected PAC's associational rights have been abridged.[5] Although this may not be a direct result of the State's action, an indirect abridgement of associational rights is just as obnoxious. See Buckley, 424 U.S. at 65, 96 S.Ct. 612 (the Court applies strict scrutiny even when "any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct ...").
 
 CONCLUSION
 
 92
 I do not question the legitimacy of the State's interest to prevent corruption and perceived corruption. The State asserts that in order to prevent corruption or the perception of corruption, it must limit the amount of influence special interests exert over candidates. The State fails to provide evidence of corruption or a genuine threat of corruption by PACs as a monolithic group. Furthermore, the State asserts that the limit is closely drawn to its interest in preventing corruption by PACs; however, it increases the amount a political party may contribute to a candidate without imposing any restriction on the amount a PAC may contribute to a political party. In addition, the State seeks to prevent PAC contributions from forming a large portion of a candidate's contributions without first defining what constitutes a "large portion" and instead chooses an arbitrary limit without regard to the ratio of PAC contributions as compared with other contributions. Finally, the State asserts that no associational freedoms have been unnecessarily abridged because if candidates "PAC out," the candidate may refund some PAC money to make room for the other PAC money. In reality, the unintended result is that it limits the number of PACs who can participate in political speech without affecting the amount of PAC money involved in Montana's legislative elections. Based on the foregoing, I conclude that the aggregate PAC limit fails the Buckley standard. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 It is worth observing that the term "special interest" seems to be used in the pejorative sense by Montana, even to the point of subtly equating it with corruption. In a democracy, every thoughtful voter and financial supporter (large or small) represents a "special interest." It is only when a particular interest becomes a corrupting one that the state can claim an interest which justifies regulation
 
 
 [2]
 Conversely, inDaggett v. Commission on Governmental Ethics and Election Practices, 205 F.3d 445, 457 (1st Cir.2000), under the guidelines of Shrink Missouri, the First Circuit Court of Appeals relied on a poll as evidence of corruption and the appearance of corruption. Similarly, the district court in Landell v. Sorrell, 118 F.Supp.2d 459, 469, 478 (D.Vt.2000), relied on polling information to demonstrate an erosion of public confidence, noting that "[t]ypical barometers of citizen concern such as polls and media coverage" have been used by many other courts in reviewing the governmental interest in enacting contribution limits. In affirming in part and vacating and remanding in part the Vermont district court's decision, the Second Circuit Court of Appeals also relied on the public opinion polls. Landell v. Vermont Public Interest Research Group, 2002 WL 1803685, at *18 (2d Cir. August 7, 2002).
 
 
 [3]
 The majority inAtkins v. Virginia, relies on polling data as evidence of a widespread consensus among Americans that executing the mentally retarded is wrong. ___ U.S. ___, ___ n. 21, 122 S.Ct. 2242, 2249 n. 21, 153 L.Ed.2d 335 (June 20, 2002). In his dissent, Chief Justice Rehnquist reaffirms that Stanford's reasoning "makes perfectly good sense, and the Court offers no basis to question it." Id. at 2254 (Rehnquist, C.J., dissenting). Indeed, Chief Justice Rehnquist not only challenges the legitimacy of the Court's reliance on public opinion polls, but also criticizes the deficiencies inherent in such polls, and the Court's "blind-faith credence" afforded the polls brought to its attention. Id. at 2255.
 
 
 [4]
 Montana cites as evidence of corruption or perceived corruption complaints from the 1988 election relating to alleged illegal transfers made by the national Republican Party and the Montana Republican Party. (ER 344, 830). The Supreme Court recognized that "political parties also share relevant features with many PAC's, both having an interest in, and devoting resources to, the goal of electing candidates who will `work to further' a particular `political agenda,' which activity would benefit from coordination with those candidates."Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 624, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (citation omitted). Thus, the aggregate PAC contribution limit is not narrowly tailored to achieve Montana's goal of eliminating the influence of large amounts of money in Montana politics.
 
 
 [5]
 Although the majority finds that PACs may contribute to a candidate's campaign through other means such as volunteering services, endorsing the candidate or independently buying advertising in support of the candidate, I do not find less corruption or less perceived corruption merely by distinguishing between direct monetary contributions and indirect contributions to a candidate's campaign. What the majority fails to recognize is that influence over a candidate may come in forms other than monetary contributions. In addition, PACs may decide that they "may add more to political discourse by giving rather than spending, if the donee is able to put the funds to more productive use than can the[PAC];" therefore, depriving PACs of that choice is an abridgement of associational freedomsShrink Mo., 528 U.S. at 416-17, 120 S.Ct. 897 (Thomas, J., dissenting) (citing Colorado Republican, 518 U.S. at 636, 116 S.Ct. 2309 (Thomas, J., concurring in judgment and dissenting in part)); see also Federal Election Comm'n. v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 261, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." Shrink Mo., 528 U.S. at 418, 120 S.Ct. 897 (Thomas, J., dissenting) (quoting Riley v. National Federation of Blind of N.C., Inc., 487 U.S. 781, 790-91, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988)).