**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DOUG LAIR; STEVE DOGIAKOS; AMERICAN TRADITION PARTNERSHIP; AMERICAN TRADITION PARTNERSHIP PAC; MONTANA RIGHT TO LIFE ASSOCIATION PAC; SWEET GRASS COUNCIL FOR COMMUNITY INTEGRITY; LAKE COUNTY REPUBLICAN CENTRAL COMMITTEE; BEAVERHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE; JAKE OIL, LLC; JL OIL, LLC; CHAMPION PAINTING; JOHN MILANOVICH, *Plaintiffs-Appellees*, | No. 16-35424 D.C. No. 6:12-cv-00012-CCL OPINION |
| RICK HILL, Warden, *Intervenor-Plaintiff-Appellee*, | |
| v. | |
| JONATHAN MOTL, in his official capacity as Commissioner of Political Practices; TIM FOX, in his official capacity as Attorney General of the State of Montana; LEO J. GALLAGHER, in his official capacity as Lewis and Clark County Attorney, *Defendants-Appellants*. | |

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, Senior District Judge, Presiding

Argued and Submitted March 21, 2017
San Francisco, California

Filed October 23, 2017

Before:  Raymond C. Fisher, Carlos T. Bea
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Bea

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's judgment in an action challenging Montana's limits on the amount of money individuals, political action committees and political parties may contribute to candidates for state elective office.

The panel held that Montana's limits, as set forth in Montana Code Annotated § 13-37-216, were both justified by and adequately tailored to the state's interest in combating quid pro quo corruption or its appearance. The panel held that Montana had shown the risk of actual or perceived quid pro quo corruption in Montana politics was more than "mere conjecture." The state offered evidence of attempts to purchase legislative action with campaign contributions. The panel held that contribution limits served the state's important interest in preventing this risk of corruption from becoming reality.

The panel held that Montana's limits were also "closely drawn" to serve the state's anti-corruption interest. The limits targeted those contributions most likely to result in actual or perceived quid pro quo corruption – high-end, direct contributions with a significant impact on candidate fundraising. Moreover, the limits were tailored to avoid favoring incumbents, not to curtail the influence of political parties, and to permit candidates to raise enough money to make their voices heard. Although Montana's limits were

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

lower than most other states' in absolute terms, they were relatively high when comparing each state's limits to the cost of campaigning there. Thus, Montana's chosen limits fell within the realm of legislative judgments the courts could not second guess.

Dissenting, Judge Bea stated that the district court properly evaluated the evidence submitted by Montana's officials and found the officials had not established the only constitutionally permissible and valid state interest sufficient to justify Montana's campaign contribution limits: the prevention of corruption or its appearance.

## COUNSEL

Matthew T. Cochenour (argued), Helena, Montana, for Defendants-Appellants.

James Bopp (argued), Terre Haute, Indiana, for Plaintiffs-Appellees.

**OPINION**

FISHER, Circuit Judge:

Montana limits the amount of money individuals, political action committees and political parties may contribute to candidates for state elective office. The district court invalidated these limits as unduly restrictive of political speech under the First Amendment. Because Montana's limits are both justified by and adequately tailored to the state's interest in combating quid pro quo corruption or its appearance, we reverse.

Montana has shown the risk of actual or perceived quid pro quo corruption in Montana politics is more than "mere conjecture," the low bar it must surmount before imposing contribution limits of any amount. The state has offered evidence of attempts to purchase legislative action with campaign contributions. Contribution limits serve the state's important interest in preventing this risk of corruption from becoming reality.

Montana's limits are also "closely drawn" to serve the state's anti-corruption interest. The limits target those contributions most likely to result in actual or perceived quid pro quo corruption – high-end, direct contributions with a significant impact on candidate fundraising. Moreover, the limits are tailored to avoid favoring incumbents, not to curtail the influence of political parties, and to permit candidates to raise enough money to make their voices heard. Although Montana's limits are lower than most other states' in absolute terms, they are relatively high when comparing each state's limits to the cost of campaigning there. Thus, Montana's

chosen limits fall within the realm of legislative judgments we may not second guess.

## I. Background

### A. Montana's Contribution Limits

In 1994, Montana voters passed Initiative 118, a campaign finance reform package that included the contribution limits at issue here. I-118's limits replaced a regime that had been in place since 1975. That regime permitted individuals and political parties to contribute up to the following limits:

**Table 1: Pre-Initiative 118 Limits**

|  | Governor | Other Statewide Election | Public Service Commission | Legislature | City or County |
|---|---|---|---|---|---|
| Individual | $1500 | $750 | $400 | $250 | $200 |
| Political party | $8000 | $2000 | $1000 | $250 | $200 |

*See* Mont. Code Ann. § 13-37-216 (1975) (enacted by No. 23-4795, 1975 Mont. Laws Ch. 481 § 1).

I-118 lowered the cap on individual contributions while raising the cap on contributions from political parties.[1]

---

[1] Montana styles its limits on political parties as "aggregate" limits, meaning that a political party is treated as a single entity for contribution purposes, even if the party is broken down into a number of different local committees across the state. *See* Mont. Code Ann. § 13-37-216(2). These

Although the contribution limits at issue here originate from I-118, the limits have not remained static. Since I-118's enactment, the Montana legislature has both amended the limits and indexed them to inflation. *See id.* § 13-37-216 (2003) (raising the limits); Act of Apr. 27, 2007, 2007 Mont. Laws Ch. 328 § 1 (H.B. 706) (indexing the limits to inflation); Admin. R. Mont. 44.11.227. Moreover, unlike the pre-1994 limits, I-118's limits apply per *election* (rather than per *cycle*), so a contributor may give up to the maximum twice if a candidate faces a contested primary (once for the primary and once for the general election). *See* Mont. Code Ann. § 13-37-216(5); Mont. Comm'r of Political Practices, *Amended Office Mgmt. Policy 2.4 Reinstating Pre-Lair 2016 Campaign Contribution Limits* at 2 (May 18, 2016) ("Pre-1994 Limits Policy"), http://politicalpractices.mt.gov/content/ContributionLimitPolicy (explaining that the pre-I-118 limits applied per cycle).

Table 2 shows the post I-118 contribution limits in 1994 (when they were enacted), 2011 (when this lawsuit began) and today. Table 3 compares the pre-I-118 limits to the post I-118 limits as of 2017.

---

aggregate limits are different in kind from the ones the Supreme Court struck down in *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014). There, the aggregate limits meant that once an individual's contributions to *all* candidates added up to the aggregate limit, he could no longer give *any* money to *any* candidates. *See id.* at 1443, 1448. Montana's aggregation of political party contributions, by contrast, permits a party to contribute up to the limit to as many candidates as the party wishes.

**Table 2: Post-Initiative 118 Limits[2]**

| | Governor | | | Other Statewide Election | | | Public Service Commission | | | State Senate | | | Other Public Office | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1994 | 2011 | 2017 | 1994 | 2011 | 2017 | 1994 | 2011 | 2017 | 1994 | 2011 | 2017 | 1994 | 2011 | 2017 |
| Individual/PAC | $800 | $1000 | $1320 | $400 | $500 | $660 | $200 | $260 | $340 | $200 | $260 | $340 | $200 | $260 | $340 |
| Political party | $15,000 | $36,000 | $47,700 | $5000 | $13,000 | $17,200 | $2000 | $5200 | $6900 | $800 | $2100 | $2800 | $500 | $1300 | $1700 |

*See* Mont. Code Ann. § 13-37-216; Admin. R. Mont. 44.11.227.

[2] Limits shown are the maximum per cycle assuming a candidate faces a contested primary. Per election limits are one half of the amount shown.

**Table 3: Pre-Initiative 118 Limits vs. 2017 Limits**

|  | PRE-INITIATIVE 118 | 2017 | |
|---|---|---|---|
|  | Per Cycle | Per Cycle | Per Election |
| **Individuals/PAC** | | | |
| Governor | $1500 | $1320 | $660 |
| Other statewide | $750 | $660 | $330 |
| Public Service Commissioner | $400 | $340 | $170 |
| State legislature | $250 | $340 | $170 |
| City or county office | $200 | $340 | $170 |
| **Political Parties** | | | |
| Governor | $8000 | $47,700 | $23,850 |
| Other statewide | $2000 | $17,200 | $8600 |
| Public Service Commissioner | $1000 | $6900 | $3450 |
| State legislature | $250 | $2800 | $1400 |
| City or county office | $200 | $1700 | $850 |

## B. *Eddleman*

We first addressed – and upheld – the constitutionality of Montana's contribution limits in *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003). Applying *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), and *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), we held

> state campaign contribution limits will be upheld if (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn" – i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.

*Eddleman*, 343 F.3d at 1092.

At step one, we held Montana's limits furthered the state's "interest in preventing corruption or the appearance of corruption." *Id*. In reaching this conclusion, we noted "[t]he evidence presented by . . . Montana . . . [wa]s sufficient to justify the contribution limits imposed, and indeed carrie[d] more weight than that presented in *Shrink Missouri*." *Id.* at 1093. We defined "corruption" or its appearance to include both "instances of bribery of public officials" and "the broader threat from politicians too compliant with the wishes of large contributors." *Id.* at 1092 (quoting *Shrink*, 528 U.S. at 389).

At step two, we held Montana's limits were "'closely drawn' to avoid unnecessary abridgement of associational freedoms." *Id.* at 1093. The limits were adequately tailored to the state's "interest in preventing corruption and the appearance of corruption" because they "affect[ed] only the top 10% of contributions, and . . . the percentage affected include[d] the largest contributions" – those most likely to be associated with actual or perceived corruption. *Id.* at 1094. The limits also allowed candidates to amass sufficient resources to wage effective campaigns, as shown by testimony from candidates and statistics demonstrating the minor effects of the limits on fundraising compared to the low cost of campaigning in Montana. *See id.* at 1094–95. The limits, moreover, had caused no significant difference in the amount challengers were able to raise compared to incumbents. *See id.* at 1095. We therefore upheld Montana's limits.

## C. *Randall*

Three years later, the Supreme Court's decision in *Randall v. Sorrell*, 548 U.S. 230 (2006), left *Eddleman*'s holding on less stable footing. *Randall* invalidated Vermont's contribution limits, and a three-justice plurality led by Justice Breyer proposed a new two-part, multi-factor "closely drawn" test. As we subsequently explained,

> [u]nder [the *Randall*] test, the reviewing court first should identify if there are any "danger signs" that the restrictions on contributions prevent candidates from amassing the resources necessary to be heard or put challengers at a disadvantage vis-a-vis incumbents. [*Randall*, 548 U.S.] at 249–52.

The plurality found four "danger signs" in Vermont's contribution limits: "(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld." *Id.* at 268 (Thomas, J., concurring) (listing the plurality's "danger signs"). The plurality held, if such danger signs exist, then the court must determine whether the limits are "closely drawn."

The plurality looked to "five sets of considerations" to determine whether the statute was closely drawn: (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by *exactly* the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are . . . adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive." *Id.* at 253–62.

*Lair v. Bullock*, 798 F.3d 736, 743 (9th Cir. 2015) (*Lair II*) (last two alterations in original) (citations omitted). Although this test is in many respects similar to the tailoring inquiry at

step two of the *Eddleman* analysis, it does not map perfectly onto *Eddleman*.

## D. *Lair*

After *Randall*, the plaintiffs commenced this action challenging Montana's limits a second time. The district court concluded *Randall* abrogated *Eddleman*'s approach to evaluating contribution limits and held Montana's limits were invalid under *Randall*. *See Lair v. Murry*, 903 F. Supp. 2d 1077, 1093 (D. Mont. 2012). Montana appealed.

Because the district court's decision came weeks before a state election, Montana sought a stay pending appeal, which a motions panel of this court granted in a published decision. *See Lair v. Bullock*, 697 F.3d 1200, 1202 (9th Cir. 2012) (*Lair I*). The motions panel held *Randall* had *not* abrogated *Eddleman*, because no "opinion [in *Randall*] can be meaningfully regarded as narrower than another *and* can represent a common denominator of the Court's reasoning." *Id.* at 1205 (quoting *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1140 (9th Cir.), *amended by* 416 F.3d 939 (9th Cir. 2005)). Assuming arguendo Justice Breyer's plurality opinion was controlling, *Lair I* concluded *Randall* applied rather than altered *Buckley*, the primary decision upon which *Eddleman* had relied. *Id.* at 1206–08. Finally, even applying *Randall*'s somewhat different "closely drawn" analysis, *Lair I* concluded Montana's limits would likely survive scrutiny. *Id.* at 1208–13.

We then heard Montana's appeal on the merits. *See Lair II*, 798 F.3d at 744. In *Lair II*, we followed the motions panel's holding that *Randall* did not abrogate *Eddleman*'s general approach to evaluating contribution limits. *Id.* at 747.

We also held, however, that the Supreme Court's decisions in *Citizens United v. FEC*, 558 U.S. 310 (2010), and *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), had limited the important state interest at *Eddleman*'s first step to preventing "quid pro quo corruption, or its appearance." *Lair II*, 798 F.3d at 746. *McCutcheon* defined quid pro quo corruption as "a direct exchange of an official act for money" or "dollars for political favors" and the "appearance" of quid pro quo corruption as "public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions to particular candidates." 134 S. Ct. at 1441, 1450 (internal quotation marks omitted). Because *Eddleman* had relied on a broader definition of corruption – embracing both quid pro quo and a generalized "access and influence" theory – *Citizens United* and *McCutcheon* undermined *Eddleman*'s holding that Montana's limits were justified by an important state interest. We therefore remanded for the district court to evaluate Montana's limits under the *Eddleman* framework, but with the important state interest limited to preventing actual or perceived quid pro quo corruption.

On remand, the district court held the limits unconstitutional under both prongs of *Eddleman*. In the district court's view, Montana did not provide adequate evidence that its contribution limits further the state's interest in combating quid pro quo corruption or its appearance. The court acknowledged evidence of various attempts to obtain political favors through campaign contributions but concluded these examples were inadequate because they did not show the attempted corruption succeeded. "The sticking point with respect to the evidence Defendants rely upon is that the quids in each one of the cited instances were either rejected by, or were unlikely to have any behavioral effect

upon, the individuals toward whom they were directed." *Lair v. Motl*, 189 F. Supp. 3d 1024, 1034 (D. Mont. 2016). Under *Eddleman*'s "closely drawn" prong, the district court concluded the limits both prevented candidates from campaigning effectively and were not narrowly focused, "because they were expressly enacted to combat the *impermissible* interests of reducing influence and leveling the playing field." *Id.* at 1035. Montana again appealed. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## II.  Standard of Review

We generally review a district court's legal conclusions de novo and its factual findings for clear error. *See Lair II*, 798 F.3d at 745. In the First Amendment context, however, "our review [of the district court's fact finding] is more rigorous than other cases." *Id.* at 748 n.8; *see also Randall*, 548 U.S. at 249 (plurality opinion) ("[C]ourts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward assessing the proportionality of the restrictions."). In addition, we "review the application of [the] law to those facts de novo on free speech issues." *Lair II*, 798 F.3d at 745.

## III.  Discussion

### A.  Important State Interest

Under *Eddleman*, we ask first whether "there is adequate evidence that [Montana's] limitation[s] further[] . . . [the] important state interest" of preventing actual or perceived quid pro quo corruption. 343 F.3d at 1092. This step of the inquiry is divorced from the actual amount of the limits – it

is a threshold question whether *any* level of limitation is justified. As we explained in *Eddleman*:

> [The plaintiff] does not dispute that [Montana's interest in combating corruption] is sufficient to justify campaign contribution limits. Rather, [the plaintiff] argues that the limits imposed are unnecessarily stringent . . . .
>
> This, however, is not the appropriate inquiry [at step one]. The correct focus . . . is whether the state has presented sufficient evidence of a valid interest, not whether it has justified a particular dollar amount. The latter inquiry, if ever appropriate, occurs in the second part of our analysis, in examining whether the restriction is "closely drawn."

*Id.*

To satisfy its burden, Montana must show the risk of actual or perceived quid pro quo corruption is more than "mere conjecture." *Id.* (quoting *Shrink*, 528 U.S. at 392); *see McCutcheon*, 134 S. Ct. at 1452 (reiterating the "mere conjecture" standard). Montana need not show any instances of actual quid pro quo corruption. *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011). It must show "only that the perceived threat [is] not . . . 'illusory.'" *Eddleman*, 343 F.3d at 1092 (quoting *Buckley*, 424 U.S. at 27).

This evidentiary burden is lowest where, as here, the state's purported interest is neither "novel" nor "implausible."

Because the regulations at issue in *Shrink* were similar to those in *Buckley*, the state's asserted interest was neither novel nor implausible.  Therefore, the Court declined to impose, let alone articulate, a stringent evidentiary burden.  *Shrink* dealt with direct contributions to candidates, and *Buckley* established that a limit on the amount of such contributions is "only a marginal restriction upon the contributor's ability to engage in free communication" that can be justified by the government's interest in preventing "political *quid pro quo* from current and potential office holders."  424 U.S. at 20–21, 26.

*Thalheimer*, 645 F.3d at 1122 (citations and internal quotation marks omitted).[3]

Here, the important state interest requirement is satisfied.  The plaintiffs do not dispute that Montana's interest in combating quid pro quo corruption or its appearance justifies some level of contribution limit.  Indeed, the plaintiffs conceded at oral argument that they believed Montana's pre-1994 limits were constitutional.

Even if the plaintiffs challenged this conclusion they would not succeed, because Montana's evidence shows the threat of actual or perceived quid pro quo corruption in

---

[3] This conclusion is consistent with the *Randall* plurality's decision, which did not suggest Vermont lacked a valid interest in combating quid pro quo corruption.  The plurality's analysis was focused entirely on the tailoring of Vermont's limits.  *See Randall*, 548 U.S. at 248–60 (plurality opinion).

Montana politics is not illusory. State Representative Hal Harper testified groups "funnel[] more money into campaigns when certain special interests know an issue is coming up, because it gets results." State Senator Mike Anderson sent a "destroy after reading" letter to his party colleagues, urging them to vote for a bill so a PAC would continue to funnel contributions to the party:

> Dear Fellow Republicans. Please destroy this after reading. Why? Because the Life Underwriters Association in Montana is one of the larger Political Action Committees in the state, and I don't want the Demo's to know about it! In the last election they gave $8,000 to state candidates. . . . Of this $8,000 – Republicans got $7,000 – you probably got something from them. This bill is important to the underwriters and I have been able to keep the contributions coming our way. In 1983, the PAC will be $15,000. Let's keep it in our camp.

State Senator Bruce Tutvedt stated in a declaration that during the 2009 legislative session the National Right to Work group promised to contribute at least $100,000 to elect Republican majorities in the next election if he and his colleagues introduced and voted for a right-to-work bill in the 2011 legislative session. Finally, a state court found two 2010 state legislature candidates violated state election laws by accepting large contributions from a corporation that "bragged . . . that those candidates that it supported 'rode into office in 100% support of [the corporation's] . . . agenda.'" *See Comm'r of Political Practices v. Prouse*, DDV-2014-250

(1st Jud. Dist. Mont. 2016); *Comm'r of Political Practices v. Boniek*, XADV-2014-202 (1st Jud. Dist. Mont. 2015).

In concluding this evidence failed to justify contribution limits, the district court imposed too high an evidentiary burden on Montana.[4] The court held Montana's evidence was inadequate because the attempted corruption did not succeed – the "quids" did not lead to "quos." *See Lair*, 189 F. Supp. 3d at 1034. But Montana need not show any completed quid pro quo transactions to satisfy its burden. It simply must show the risk of actual or perceived quid pro quo corruption is not illusory, a bar Montana's evidence easily clears. Montana's contribution limits are of the same kind as in *Shrink* and *Buckley*, and they are supported by at least as much evidence as was present in those cases. *See Shrink*, 528 U.S. at 393–94 (noting a statement from a legislator "that large contributions have 'the real potential to buy votes'"; "newspaper accounts of large contributions supporting inferences of impropriety"; an example of a "state

---

[4] Like the district court, the dissent would hold Montana to a more stringent evidentiary burden than our cases or the Supreme Court's permit. The dissent says Montana must prove the *existence* of actual or apparent corruption (Dissent at 37, 38, 41, 42), whereas we – following the Supreme Court – have repeatedly held that all Montana must do is show a "threat" or "risk" of actual or apparent corruption. *Eddleman*, 343 F.3d at 1092; *Farris v. Seabrook*, 677 F.3d 858, 865–66 (9th Cir. 2012). The dissent similarly suggests Montana must show evidence of a completed, successful exchange of dollars for political favors to meets its evidentiary burden. Dissent at 37 n.1, 38, 40, 41–42. But Montana need only show that the threat of actual or apparent corruption is "not . . . illusory" or is more than "mere conjecture." *Buckley*, 424 U.S. at 27; *Shrink*, 528 U.S. at 392. For example, even if the "destroy after reading" letter did not result in the successful purchase of a block of votes in exchange for contributions, it certainly shows that the threat of such arrangements is non-illusory.

representative . . . 'accused of sponsoring legislation in exchange for kickbacks'" (but not convicted); and a scandal in which the former attorney general pled guilty to misusing state property to benefit campaign contributors); *Buckley*, 424 U.S. at 27 n.28 (referencing generic "abuses uncovered after the 1972 elections"). Montana, therefore, has offered adequate evidence that its limits further the important state interest of preventing quid pro quo corruption or its appearance.[5]

## B. "Closely Drawn"

We next address whether "the limits are 'closely drawn' – i.e., [whether] they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Eddleman*, 343 F.3d at 1092. This tailoring inquiry "ensures the state's contribution limits are not lower than needed to accomplish the state's goal of preventing quid pro quo corruption or its appearance." *Lair II*, 798 F.3d at 740 n.4. In conducting this inquiry, courts owe significant deference to the legislative process. As *Buckley* explained, courts have "no scalpel to probe" these legislative judgments, so "distinctions in degree

---

[5] In reaching the contrary conclusion, the dissent points to no case – and we are aware of none – where the risk of actual or apparent corruption was inadequate to justify contribution limits of *some* level. The plaintiffs themselves concede Montana's pre-Initiative 118 limits satisfy the First Amendment. Under the dissent's logic, however, Montana's evidence is inadequate to justify any contribution limits whatsoever, no matter how high. *See Eddleman*, 343 F.3d at 1092 (explaining that the valid interest analysis is divorced from whether the state has justified the particular dollar amount of the limits at issue). On this record, that unprecedented conclusion is simply untenable.

become significant only when they . . . amount to differences in kind." 424 U.S. at 30 (citation omitted). Thus, "the dollar amounts employed to prevent corruption should be upheld unless they are 'so radical in effect as to render political association ineffective, drive the sound of a candidate's voice [below] the level of notice, and render contributions pointless.'" *Eddleman*, 343 F.3d at 1094 (quoting *Shrink*, 528 U.S. at 397).

## 1.  Narrow Focus

The first part of the closely drawn analysis is whether the limits are narrowly focused on Montana's anti-corruption interest.  We assess the "fit between the stated governmental objective and the means selected to achieve that objective," *McCutcheon*, 134 S. Ct. at 1445, looking at whether the limits target "the narrow aspect of political association where the actuality and potential for corruption have been identified," *Buckley*, 424 U.S. at 28.

Here, because Montana's limits target the kinds of contributions most likely to be associated with quid pro quo corruption, they satisfy the narrow focus inquiry.  First, I-118 targeted only the top 10% of pre-1994 contributions in Montana – the high-end contributions most likely to result in actual or perceived corruption.  *See Eddleman*, 343 F.3d at 1094.  We relied on this fact in *Eddleman* to conclude the limits were narrowly focused.  *See id.*  Because the I-118 limits were not indexed to inflation when *Eddleman* was decided, moreover, today's limits affect an even smaller percentage of contributions at the top of the range than they did at that time.

Second, Montana places the strictest limits on direct monetary contributions to candidates – the type of largesse most likely to effect actual or perceived corruption. *See Shrink*, 528 U.S. at 393–94 (focusing on direct contributions in discussing the evidence of corruption justifying Missouri's contribution limits). Political party contributions – i.e., indirect contributions – are capped tens of thousands of dollars higher. *Cf. Randall*, 548 U.S. at 256 (plurality opinion) (imposing the same limits on individuals and political parties cuts against upholding the limits). Moreover, Montana's "statute in no way prevents [individuals and] PACs from affiliating with their chosen candidates in ways other than direct contributions, such as donating money to a candidate's political party, volunteering [their] services, sending direct mail to their supporters, or taking out independent newspaper, radio, or television ads to convey their support." *Eddleman*, 343 F.3d at 1094. This, too, shows tailoring for the type of contribution most likely associated with dollars-for-favors exchanges, without unnecessarily curtailing other forms of political expression.

The plaintiffs argue Montana could accomplish its goals with higher limits, but they seek a level of constitutional precision the Supreme Court has never required – Montana need not "fine tune" its limits to stay within the First Amendment's boundaries. As *Buckley* explained,

> Appellants' first overbreadth challenge . . .
> rests on the proposition that most large
> contributors do not seek improper influence
> . . . . Although the truth of that proposition
> may be assumed, it does not undercut the
> validity of the $1,000 contribution limitation.
> Not only is it difficult to isolate suspect

contributions, but, more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.

A second, related overbreadth claim is that the $1,000 restriction is unrealistically low because much more than that amount would still not be enough to enable an unscrupulous contributor to exercise improper influence . . . . While the contribution limitation provisions might well have been [higher in some cases], Congress' failure to engage in such fine tuning does not invalidate the legislation.

424 U.S. at 29–30. Here, especially given that the plaintiffs do not dispute the constitutionality of the pre-1994 limits, they ask us to police a "distinction[] in degree," not a "difference[] in kind." *Id.* at 30 (noting the difference between $1,000 and $2,000 was a distinction in degree). This is a legislative judgment we decline to second guess.[6]

---

[6] At oral argument, the plaintiffs contended Montana must justify the *change* between the pre-1994 limits and today's limits. Every contribution limit case of which we are aware, however, evaluates the *current* limits, and the plaintiffs point to no authority suggesting otherwise. In *Randall*, for example, the Court evaluated Vermont's existing limits without discussing whether the *change* from Vermont's previous regime was justified. *See* 548 U.S. at 237, 239, 248–63 (plurality opinion). Even if the change in limits were relevant, for the reasons we have discussed the difference between the pre-1994 limits and today's

We acknowledge Montana's chosen dollar amounts might appear low, but they are not constitutionally suspect. First, Montana's limits are not an outlier compared to other states' limits:

**Table 4: 2015–2016 Limits on Contributions to Gubernatorial Candidates[7]**

| State | Limit |
|-------|-------|
| Montana | $1320 per cycle |
| Alaska | $1000 per cycle |
| Colorado | $1150 per cycle |
| Delaware | $1200 per cycle |
| Massachusetts | $1000 per calendar year |
| Rhode Island | $1000 per calendar year |

Second, even if the limits are low in absolute terms, they are quite reasonable compared to the low cost of campaigning in the state. Montana to the present is "one of the least expensive states in the nation in which to run a political campaign." *Eddleman*, 343 F.3d at 1094. When contribution limits are viewed in relation to the cost of campaigning for a state house seat, Montana's limits are proportionally higher

---

limits is not constitutionally significant. *See Buckley*, 424 U.S. at 30.

**[7]** *See* Nat'l Conf. of State Legs., *State Limits on Contributions to Candidates 2015–2016 Election Cycle* (July 31, 2015), www.ncsl.org/r esearch/elections-and-campaigns/state-limits-on-contributions-to-candidates.aspx.

than both the federal limits and those of 12 other states.[8] Table 5 shows contribution limits relative to the cost of campaigning in the nine states within the Ninth Circuit:

**Table 5: Maximum Contributions as a Percentage of**

**Total Fundraising in 2010 State House Races[9]**

| State | Avg. Total | Limit | Ratio |
|---|---|---|---|
| Montana | $8,231 | $320 | 3.89% |
| Alaska | $36,870 | $1000 | 2.71% |
| Arizona | $37,411 | $410 | 1.1% |
| California | $355,789 | $7800 | 2.19% |
| Hawaii | $26,956 | $2000 | 7.42% |
| Idaho | $17,245 | $2000 | 11.6% |
| Nevada | $74,634 | $10,000 | 13.4% |
| Oregon | $116,536 | none | n/a |
| Washington | $85,039 | $1600 | 1.88% |

[8] For state senate races, Montana's limits are proportionally higher than both the federal limits and those of 14 other states.

[9] For simplicity's sake, the term "state house" refers to the lower chamber of the state legislature, even if a given state calls its lower chamber something else.

Montana's limits are low only if we ignore the low cost of campaigning in the state. Once that reality is factored in, Montana's limits fit well within the mainstream.

Third, Montana's limits are reasonable compared to the size of a typical contribution in Montana. In 2010 state house races, for example, the average individual contributed about $90, when the per cycle limit was $320. In the 2008 race for governor, the typical contribution was only $185, when the per cycle limit was $1200. Thus, in addition to targeting only the top 10% of contributions, the limits do not come close to curtailing the average contributor's participation in campaigns.

Fourth, Montana's limits are reasonably keyed to the actual evidence showing a risk of corruption in Montana. In his "burn after reading" letter, written shortly before I-118 was passed, Senator Anderson suggested a political action committee could obtain political favors from an entire block of legislators through contributions totaling just $8,000. Even adjusted for inflation, that is only a few hundred dollars per legislator. If such contributions can corrupt the legislative process, Montana's limits are anything but an exaggerated response to the risk of actual or perceived corruption that exists in the state.

We should not – and indeed cannot – be in the business of fine tuning contribution limits for states. These judgments are for state lawmakers to make (including voters acting through the initiative process). As judges, our limited role is to ensure that a state chooses limits that are not "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Shrink*, 528 U.S. at 397.

Because Montana's limits satisfy this standard, we hold they are narrowly focused.

The district court concluded otherwise because, in the 1994 Voter Information Pamphlet attached to I-118, the initiative's sponsors argued "[t]here is just way too much money in Montana politics" and urged voters to pass I-118 to prevent "[m]oney from special interests and the wealthy" from "drowning out the voice of regular people," reasons that are inadequate to justify contribution limits under *McCutcheon*. The district court thus concluded the Montana voters who approved I-118 acted with an impermissible motive, meaning the limits "could never be said to focus narrowly on a constitutionally-permissible anti-corruption interest." *Lair*, 189 F. Supp. 3d at 1035. We disagree.

The district court incorrectly cast the narrow focus test as a motive inquiry that looks at the voters' underlying intent when they enacted the limits. The narrow focus test, however, is a tailoring test, not a motive test. It measures how effectively the limits target corruption compared to how much they inhibit associational freedoms – i.e., whether the

> limitation focuses precisely on the problem of large campaign contributions – the narrow aspect of political association where the actuality and potential for corruption have been identified – while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources.

*Buckley*, 424 U.S. at 28; *see Eddleman*, 343 F.3d at 1094 (analyzing fit without reference to underlying voter intent). We are aware of no case looking to underlying legislative or voter intent in making this evaluation. Although there is some logic that the sponsors' goal behind I-118 reveals something about the limits' fit, the actual content and effect of the limits – which, as discussed, target the contributions most likely to generate corruption or its appearance – better show their tailoring. We therefore disapprove the district court's reasoning.

## 2. Contributors' Ability to Affiliate with Candidates

The closely drawn inquiry next assesses whether the contribution limits "leave the contributor free to affiliate with a candidate." *Eddleman*, 343 F.3d at 1092. Montana not only permits such affiliation through direct monetary contributions, but also "in ways other than direct contributions, such as donating money to a candidate's political party, volunteering . . . , sending direct mail . . . , or taking out independent newspaper, radio, or television ads to convey . . . support." *Id*. at 1094. The plaintiffs effectively concede that contributors may associate with candidates, arguing only that some contributors would like to give *more* than the limits allow. Thus, Montana's limits satisfy prong two of the closely drawn analysis.

## 3. Candidates' Ability to Campaign Effectively

The final part of the closely drawn inquiry asks whether Montana's limits prevent candidates from amassing sufficient resources to campaign effectively. *Eddleman* held they did not, *see* 343 F.3d at 1095, and we see no reason to reach a different conclusion.

To begin with, the evidence from Montana candidates shows the limits do not prevent effective campaigning. Montana Secretary of State Mark Cooney testified, "I don't feel that the limitations . . . have been harmful to my candidacy at all." Representative Harper testified the limits had "[j]ust negligible effects" on his campaigns. Another candidate testified he raised more money after the limits were in place than before. Although one candidate initially testified the limits made it "more difficult" for him to raise enough money, he later clarified he "didn't mean that [his campaigns] were ineffective." He explained, "I mean I did what I had to to win. If my opponents would have been tougher and I felt that I needed to, I would have raised more money, gone out and done the work that I needed to to run that effective campaign."

One candidate witness (Mike Miller) did suggest the limits made his campaigns ineffective, but the facts belie his claim. Between 2008 and 2014, Miller's campaigns received maxed-out contributions from only seven of his approximately 200 contributors, and Miller won all four of his elections.

Statistical data confirm that the limits do not prevent effective campaigning. Plaintiffs' expert Clark Bensen opined that "a high proportion of maxed-out donors" would be an indicator that "the limits were too low." Suppl. Excerpts R. 109 ("Bensen Report"). In Montana, however, maximum contributions are relatively rare. In 2010 state house and senate races, for example, 85% of individual

contributors gave less than the statutory limit.[10]   Political parties contributed below the limit 78% of the time.  Numbers from other years and other races are comparable.  This low proportion of maximum contributions shows the limits do not unduly inhibit candidate fundraising.

The plaintiffs argue competitive elections provide the proper context for evaluating contribution limits, and they point out that the percentage of maximum contributions in *competitive* elections is higher, about 29%.  The plaintiffs are correct that the plurality opinion in *Randall* focused on competitive races rather than average ones.  *See* 548 U.S. at 255–56.  But this focus was based on the potential advantage contribution limits might grant incumbents in competitive races.  *See id*.   Because these races tend to be more expensive, challengers may need to rely on large contributions more than incumbents do, so overly strict limits could disproportionately affect challengers.  *See id.* at 256.

The plaintiffs, however, have not shown this problem exists in Montana.   Incumbents and challengers in competitive races have virtually the same percentage of maxed-out contributors.  *See* Bensen Report at 101 ("There was very little difference with respect to incumbency [versus challengers]" as to who relied on maximum or near maximum contributions in competitive races.); *cf. Randall*, 548 U.S. at 253–55 (citing to an expert report, also by Clark Bensen, showing Vermont's contribution limits significantly reduced challenger fundraising in competitive races).   Indeed, we noted in *Eddleman* that "the average gap between the total

---

[10] 1,402 maximum donations; 4,469 donations below the maximum but above the $35 reporting threshold; estimated 3,768 donations below the $35 threshold, assuming an average contribution of $20.

amount of money raised by incumbents and challengers for all legislative races was only $65.00 per race." 343 F.3d at 1095.

Three other circumstances underscore the tailoring of Montana's limits to avoid unduly favoring incumbents. First, Montana permits political parties to contribute far more than individuals and PACs. As the plaintiffs' own expert testified, political parties give predominantly to challengers in Montana, whereas PACs contribute more often to incumbents. In *Randall*, by contrast, Vermont imposed identical limits on parties, individuals and PACs, reflecting an incumbency bias cutting against the limits' constitutionality. *See* 548 U.S. at 256–57 (plurality opinion). Second, Montana's limits apply per election, rather than per cycle, meaning a contributor may give up to the limit twice if a candidate runs in a contested primary. Because challengers generally face contested primaries more often than incumbents, per election limits mitigate the incumbent fundraising advantage. This, too, distinguishes this case from *Randall*, where Vermont's per cycle limits were a "danger sign" of the limits' unconstitutionality. *See id.* at 249. Third, by prohibiting "incumbents from using excess funds from one campaign in future campaigns," Montana "keeps incumbents from building campaign war chests and gaining a fundraising head start over challengers." *Eddleman*, 343 F.3d at 1095. The anti-challenger bias that animated the plurality in *Randall* simply is not present here.

In sum, challengers and incumbents alike remain capable of running effective campaigns in Montana. Even if some candidates might prefer to seek fewer, larger contributions to meet their fundraising needs (rather than more numerous, smaller contributions), when "a candidate is merely required

'to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression,' the candidate's freedom of speech is not impugned by limits on contributions." *Id*. at 1091 (quoting *Buckley*, 424 U.S. at 21–22). We hold Montana's limits do not prevent candidates from amassing sufficient resources to campaign effectively.

*   *   *

Montana's limits are closely drawn to further the state's important interest in preventing actual or perceived quid pro quo corruption. Montana has shown the risk of quid pro quo corruption in Montana is not illusory. Its chosen contribution limits are narrowly focused; they do not prevent contributors from affiliating with the candidates of their choosing; and they do not prevent candidates from raising the money needed for effective campaigning, whether the candidate is an incumbent or challenger and whether the race is competitive or average. We hold, therefore, that Montana's limits survive First Amendment scrutiny. The district court erred by holding otherwise.

## C. *Randall*

Even if we were wrong in *Lair II* to hold *Eddleman* controls our evaluation of Montana's contribution limits, we would reach the same conclusion under the plurality's decision in *Randall*. The *Randall* test first looks for "danger signs" that the limits prevent candidates from raising enough money to be heard and challengers from raising enough to compete against incumbents. *See* 548 U.S. at 249–52 (plurality opinion). The plurality found four such "danger

signs" in Vermont's limits:  "(1) The limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we have previously upheld." *Id.* at 268 (Thomas, J., concurring in the judgment) (listing the plurality's "danger signs").

If these "danger signs" exist, a court then assesses

> "five sets of considerations" to determine whether the statute was closely drawn: (1) whether the "contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns"; (2) whether "political parties [must] abide by *exactly* the same low contribution limits that apply to other contributors"; (3) whether "volunteer services" are considered contributions that would count toward the limit; (4) whether the "contribution limits are . . . adjusted for inflation"; and (5) "any special justification that might warrant a contribution limit so low or so restrictive." [*Randall*, 548 U.S.] at 253–62.

*Lair II*, 798 F.3d at 743 (first alteration in original) (citations omitted).

The motions panel in *Lair I* addressed each of these "danger signs" and "considerations" at length, concluding that *Randall* likely "would not have mandated a different result in *Eddleman.*"  697 F.3d at 1208; *see id.* at 1208–13.

We agree. Montana's limits apply per election, not per cycle. The lowest limits do not apply to political parties. The limits are not the lowest in the nation; they are higher than Alaska's ($1000 per cycle for governor), Colorado's ($1150), Delaware's ($1200) and arguably Massachusetts' ($1000 per calendar year) and Rhode Island's ($1000 per calendar year). Although Montana's limits are lower in absolute terms than those the Court has previously upheld, they are significantly higher than those the Court struck down in *Randall* ($400 per cycle for governor). They are also higher as a percentage of the cost of campaigning than the federal limits *Buckley* upheld.[11]   Montana's limits do not favor incumbents or prevent challengers from fundraising effectively. Political parties may contribute far more than individuals and PACs; they also may provide campaigns with paid staffers, whose wages are not counted against the party's contribution limits. *See* Mont. Admin. R. 44.11.225(3).   Contributors may volunteer for campaigns and otherwise express their support in ways beyond direct contributions.   Finally, Montana's

---

[11] As discussed above, Montana's limits are particularly modest when the cost of campaigning is taken into account – a useful way to measure a maximum contribution's impact on a campaign.   A maximum contribution in Montana accounted for 3.89% of the total amount a 2010 state house candidate raised.   This percentage was higher than the percentage for the federal limits (0.5% across all House of Representatives races), the dollar amounts of which the Court approved in *Buckley*. Montana's limits are also proportionally higher than those in Alaska (2.71%), Arizona (1.1%), California (2.19%), Colorado (1.1%), Connecticut (2.19%), Delaware (1.91%), Florida (0.87%), Massachusetts (2.14%), Michigan (0.94%), Tennessee (3.78%), Washington (1.88%) and Wisconsin (2.98%).   Thus, although Montana's limits are on the low side in absolute terms – but not an outlier – they are relatively high given the low cost of campaigning in the state.

limits are adjusted for inflation.  Accordingly, Montana's contribution limits would survive scrutiny even if *Randall* governed.

## IV.  Conclusion

Our Constitution permits contribution limits to serve the narrow but vital purpose of preventing actual or apparent quid pro quo corruption in politics.  Because the limitations imposed by Montana Code Annotated § 13-37-216 both further that interest and are adequately tailored to it, they satisfy the First Amendment.

**REVERSED.**

---

BEA, Circuit Judge, dissenting:

Our representative government requires and relies on the ready flow of ideas between elected legislators and the voters. Those ideas are mostly transmitted during election campaigns by advertisements and organized rallies, examples of free speech, neither of which come free. Contributors to the campaigns want their ideas made known and accepted by the campaigning legislators.  Restrictions on citizens' campaign contributions limit their ability to make their ideas known and to influence the legislators to accept and further those ideas. For these reasons, our First Amendment law permits limits on such contributions only if the restrictions are closely drawn to a valid, important state interest.  Courts must carefully scrutinize such limitations. *See McCutcheon v. FEC*, 134 S. Ct. 1434, 1451 (2014) ("the First Amendment requires us to err on the side of protecting political speech rather than

suppressing it" (citation omitted)).  Here, the district court properly evaluated the evidence submitted by Montana's officials and found the officials had not established the only constitutionally permissible and valid state interest sufficient to justify Montana's campaign contribution limits: the prevention of corruption or its appearance.  Thus, I respectfully dissent.

In *Montana Right to Life v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003), we upheld Montana's campaign contribution limits under a two-part test: 1) the contribution limits must respond to a valid important state interest and 2) the contribution limits must be closely drawn to that interest.  In that decision, we recognized that discouraging "undue influence" gained over legislators by contributors through their contributions could be a valid important state interest.  343 F.3d at 1096–97.  As we recognized in *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), the Supreme Court's plurality decision in *Randall v. Sorrell*, 548 U.S. 230 (2006), which held Vermont's campaign contribution limits unconstitutional under the First Amendment, did not alter *Eddleman*'s framework because no opinion received the support of a majority of the justices.

If *Citizens United* had not been decided the way it was, the Montana officials' claims here of a valid important state interest would make this an easy case for reversal.  But *Citizens United* changed all that because it narrowed what can constitute a valid important state interest (at *Eddleman*'s first step) to only the state's interest in eliminating or reducing quid pro quo corruption or its appearance.  The Supreme Court explained in *FEC v. National Conservative Political Action Committee* that "[t]he hallmark of corruption is the financial quid pro quo: dollars for political favors." 470 U.S.

480, 497 (1985). The mere prevention of influence on legislators by contributors is now *not* a valid important state interest that could justify campaign contribution limits. *Citizens United v. FEC*, 558 U.S. 310, 359 (2010); s*ee also McCutcheon*, 134 S. Ct. at 1441. As such, only the avoidance of corruption or the appearance of corruption remain as a state interest valid and important enough to limit the free speech rights of contributors exercised through their contributions to their legislators.

To establish this sole valid important state interest defendants here must demonstrate that the existence of actual or apparent quid pro quo corruption is more than "mere conjecture" and is not "illusory."[1] *Eddleman*, 343 F.3d at 1092. While an appellate court's review of a district court's factual findings is more rigorous in the First Amendment

---

[1] A common sense understanding of quid pro quo corruption suggests that it is limited to exchanges in which a politician personally pockets money in exchange for an official action that violated the politician's obligations of office. The notion that contributions to a candidate's campaign fund, one of the key mechanisms by which constituents influence their elected representatives, could ever constitute part of an improper exchange for an official act seems implausible since the contribution of funds to a campaign to effect influence is their expected and proper purpose. Despite this, the Supreme Court has earlier recognized that quid pro quo corruption includes occasions when "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves *or infusions of money into their campaigns*." *McCutcheon*, 134 S. Ct. at 1460–61 (quoting *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. at 497 (emphasis added)). As such, under Supreme Court precedent contributions made for the permissible purpose of influencing legislators can apparently constitute quid pro quo corruption in certain circumstances. Such influence is improper corruption when, in fact, the legislator acts contrary to his legal obligation(s). In our record, there is no evidence of such an illegal act.

context, our prior precedent has confirmed that we still review such factual findings with some deference. *See Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 670 (9th Cir. 1990) ("[W]e must simultaneously ensure the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact."); *see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1066–70 (9th Cir. 2002). Because the district court entered judgment on cross motions for summary judgment, however, a de novo standard of review as to the existence of a material triable issue of fact properly applies here.

A close examination of relevant evidence from the record makes clear that the district court's finding that defendants failed to carry their burden to prove the appearance or existence of quid pro quo corruption at the first step of *Eddleman*, as narrowed by *Citizens United*, was correct even if reviewed under a de novo standard. That is because the record here is devoid of any evidence of exchanges of dollars for political favors – much less for any actions contrary to legislators' obligations of office – or any reason to believe the appearance of such exchanges will develop in the future.

First, consider the letter sent by Senator Mike Anderson to his party-colleagues, urging them to vote for a bill so that money from certain political action committees would continue to flow to the Republican Party's coffers. None of the record evidence shows that any legislator accepted the deal articulated by Senator Anderson and, despite five separate investigations, Anderson himself was never found to have engaged in any unlawful practices. *Eddleman*, 343 F.3d at 1093. Rather than actual or apparent quid pro quo corruption, the event shows rejection of temptation. Next,

consider the offer to contribute $100,000 to the Republican Legislative Campaign Committee in exchange for Republican legislators' support for a right-to-work bill, as testified to by Senator Bruce Tutvedt. This offer also did not constitute quid pro quo corruption because the Republican legislators rejected it. Further, they likely would have introduced and supported such a right-to-work bill regardless of this offer, as it was consistent with their political party's policy position. More importantly, even had certain legislators accepted these offers (as Representative Hal Harper's generalized testimony suggests sometimes occurred), such actions would appear to constitute nothing more than the trading of influence and access, which are critical mechanisms through which our political system responds to the needs of constituents. *See Citizens United*, 130 S. Ct. at 910 ("that speakers may have influence over or access to elected officials does not mean that these officials are corrupt").

Similarly, the Montana state court decisions referenced by defendants do not establish actual or apparent quid pro quo corruption. These include:

- The Montana Supreme Court held in 2013 that a Public Service Commissioner unlawfully accepted financial gifts from power companies that "would tend to improperly influence a reasonable person in [the Commissioner's] position," a number of which payments the Commissioner returned to the contributor shortly after they were received. *Molnar v. Fox*, 301 P.3d 824, 832 (Mont. 2013).

- Two Montana state trial court decisions found that two 2010 legislative primary candidates violated state campaign finance laws by accepting corporate

contributions in return for promising 100 percent support for the corporations' agenda and without properly reporting such contributions. *Comm'r of Political Practices v. Boniek*, XADV-2014-202 (1st Jud. Dist. Mont. 2015); *Comm'r of Political Practices v. Prouse*, DDV-2014-250 (1st Jud. Dist. Mont. 2016).

None of these cases involved bribery or the improper trading of official acts by violating a legislator's legal obligations for monetary contributions. Two of these cases (*Boniek* and *Prouse*) were default judgments against individuals who never even made it to a general election (each lost in the Republican primaries), making quid pro quo corruption in each circumstance impossible as neither candidate ever held any office from which to grant official favors. Although the Montana court that adjudicated *Boniek* and *Prouse* labeled the conduct in both of these cases as "corruption," the court did not delineate which official actions taken by defendants in these cases constituted an illegal official act, define what "corruption" meant in this context, or explain how this finding was related to the legal claims against defendants before that court. Moreover, defendants Boniek and Prouse already held out-spoken conservative positions on issues like right-to-work, abortion, guns, and government, meaning that any official acts they may have taken to further the interests of conservative contributors had they been elected would have been consistent with their longstanding policy positions and not primarily motivated as an exchange of an illegal official act for campaign contributions.

Finally, the declaration of Montana's Commissioner of Political Practices (Jonathan Motl) that numerous cases of quid pro quo corruption occurred in Montana was rebutted by sworn declarations from the very politicians and political

candidates who, according to Motl, engaged in quid pro quo corruption. Given defendant Motl's position as Commissioner of Political Practices, which gives him broad authority to investigate political misdeeds, *see* Montana Code Annotated § 13-37-111, it is surprising, to say the least, that the only enforcement actions against purported quid pro quo corruption in Montana cited by defendants are the above-referenced, non-starter cases for violations of campaign finance or ethics rules. One would expect that if quid pro quo corruption was as widespread as Commissioner Motl asserts, he could point at least to some actual court convictions for bribery or other forms of quid pro quo corruption.

Taken together, a detailed examination of the evidence offered by defendants establishes that the district court concluded correctly that the record evidence failed to prove any actual quid pro quo corruption. This still leaves the possibility that the evidence in the record establishes the *appearance* of corruption in Montana. As *Buckley v. Valeo* explained, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U.S. 1, 27 (1976); *see also McCutcheon*, 134 S. Ct. at 1450. In other words, the appearance of quid pro quo corruption is the "public awareness of the opportunities for abuse." For the very reasons discussed above, however, none of the record evidence establishes the existence of any opportunity for quid pro quo corruption or other abuses. Where is the evidence that a legislator caused the re-routing of a freeway to benefit a commercial landowner, who had paid the legislator's vacation travels? Where is the evidence that an airport construction contractor was awarded a contract, and had

remodeled the legislator's home at little or no cost to the legislator?  Rather, the record makes clear that Montana politicians often rejected even efforts by certain interests to influence or access legislators, that even seemingly minor violations of campaign finance laws by unelected primary candidates were rigorously punished, and that Montana's Commissioner of Political Practices consistently reviewed the propriety and legality of the actions of politicians, political candidates, and various interest groups.  In other words, the only reasonable inference that may be drawn from the record evidence is that there were few opportunities for abuse and, therefore, scant public awareness of such opportunities.  As such, on this record the existence of actual or apparent quid pro quo corruption is, at best, "illusory" or "mere conjecture," such that defendants have not met their burden to establish a valid important state interest to justify the contribution limits at issue in this lawsuit.  *Eddleman*, 343 F.3d at 1092.

While it is admittedly difficult at times to distinguish between proscribed corruption and acceptable influence, given the important First Amendment interests at stake when restricting political speech we are obliged to scrutinize carefully whether a valid important state interest exists before upholding the constitutionality of such restrictions.  *See McCutcheon*, 134 S. Ct. at 1451 ("The line between quid pro quo corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights.").  Although there is admittedly some common sense to the notion that limiting the amount of money citizens may contribute to political candidates inherently forestalls corruption, because so doing also restricts speech our federal constitution requires a greater evidentiary showing than made on this record before a state may restrict political speech through campaign contribution

limits. While the panel majority's opinion pays lip service to the changes in the *Eddleman* framework rendered by *Citizens United*, the contents of its analysis at *Eddleman*'s first step demonstrate it has failed to account substantively for this change.

In footnote 5, the majority opinion notes that "[u]nder the dissent's logic…Montana's evidence is inadequate to justify any contribution limit whatsoever, no matter how high." This is quite correct. Absent a showing of the existence or appearance of quid pro quo corruption based on objective evidence, the presence of a subjective sense that there is a risk of such corruption or its appearance does not justify a limit on campaign contributions. Restrictions on speech must be based on fact, not conjecture.

Because I do not think defendants established the existence of a valid important state interest at step one of the *Eddleman* framework, I respectfully dissent.